The plaintiff appeals from a judgment entered on a jury verdict for the defendant. Alice Gaylard brought an action against Homemakers of Montgomery, Inc., d/b/a Oxford Health Care ("Oxford"), alleging negligence, wantonness, and breach of contract. Before trial, Ms. Gaylard dismissed the breach of contract claim. The circuit court ruled that Ms. Gaylard could not use a statement taken by her attorney from a witness *Page 364 
who was an employee of Oxford to cross-examine that witness. The court based its ruling on its holding that the attorney, in taking the statement, had violated Rule 4.2 of the Alabama Rules of Professional Conduct. The issue, therefore, is whether the circuit court erred in limiting cross-examination by prohibiting use of the witness's earlier statement.
Ms. Gaylard contracted with Oxford for Oxford to provide home health care services, including the periodic bathing of Ms. Gaylard. On December 16, 1992, an employee of Oxford, Dorothy Taylor, who was not named as a defendant in the action Ms. Gaylard later filed, was giving Ms. Gaylard a bath and allegedly caused Ms. Gaylard to be burned with hot water. Ms. Gaylard was subsequently hospitalized, and she alleges that the burns she says she sustained on December 16 required the hospitalization and caused her to suffer pain, discomfort, mental anguish, and emotional distress.
Before Ms. Gaylard filed this action against Oxford, Ms. Gaylard's attorney telephoned Ms. Taylor and recorded the ensuing conversation, without informing Ms. Taylor that it was being recorded. Initially, Ms. Taylor refused to discuss the bath and the burns, but, after the attorney persisted, Ms. Taylor began answering questions:
 "Q. Do you remember what happened? Can you just tell me in your own words what you remember?
 "A. I have to talk to my supervisor before I can talk to you. I can't discuss this.
 "Q. Okay. Who is your supervisor? I don't mind giving her a call or him, whoever it is.
"A. Have you talked with anybody at Oxford?
 "Q. No ma'am. Ms. Gaylard gave me your home number. I think she said you had given it to her back when you were working there.
"A. Um, hum.
 "Q. And she gave me the home number. I was just trying to get you at home thinking maybe you'd talk to me about it.
"A. Well, I don't think I should talk to you.
"Q. Well, can you just tell me what happened?
 "A. It was an incident report made. You can go to Oxford and get any information that you want.
 "Q. But that would have come from your own statement or what you reported to them, wouldn't it? Nobody was there besides you and Ms. Gaylard, right?
"A. That's right.
". . . .
 "Q. Well, can you tell me right quick what happened?
 "A. I cannot discuss it with you. I'm not going to discuss it with you. Unless you talk to my supervisor, or you can contact Oxford.
". . . .
 "Q. Can you tell me anybody to ask for when I call the company?
 "A. No. You call Oxford and you can get all that information. They'll tell you who to talk to, who you should talk to and everything.
 "Q. Okay. Thank you. You don't want to say anything about it all?
"A. No, I don't.
 "Q. Will you admit or deny that the lady was ever burned? Either way?
 "A. I'm not, no, I don't know. I can't say. All I can say, I wasn't aware that she was burned when I was there. I was, the only thing I knew was a couple of days after the incident, she said she was burned.
 "Q. She didn't explain to you as soon as the hot water was poured on her leg that it hurt her and it burned her and she was being burned?
 "A. No she didn't. Not when it happened. A couple of days later she said, 'Dot, I believe that water was too hot the other day when we bathed.' I bathed her like every other day, you know. It was on a Monday and this supposed to have happened on a Wednesday. When it happened she didn't say that it burned or anything. *Page 365 
 "Q. Did you report it to Oxford as soon as it happened?
 "A. No. I reported it when she told me she believed it was burned. That's when I reported it. I couldn't report anything that I wasn't aware of.
 "Q. And you're saying that was a few days after it happened?
"A. Right.
 "Q. You remember what day of the week it was that she told you she was burned?
 "A. Oh, I don't know. It was on a Friday when I went back and she didn't get in the tub that day I don't think and she said cause she believed that water was too hot and her leg, something was wrong with her leg and she couldn't get in the tub anyway. On a Monday is when she said that she believed she was burned.
 "Q. Okay. And she was telling you she thought that she was burned as of what day?
 "A. Uh, I don't know. A few days, the week before that.
 "Q. I see. And part of your duties when you were over there was to bathe her?
 "A. Right. That's what was my job, was to bathe her. Help her with her bath.
 "Q. Okay. Was she able herself to regulate the faucet and cut on the water and pour it in the pan? Or would you just do it for her?
 "A. I was doing it. No, she couldn't do it cause she had to stand in the tub and Ms. Gaylard's a big woman and the reason she was using the pan was because she was having trouble, the water was running cold on her before we finished the shower and she used this pan to catch the warm water to rinse off with. And the water it wasn't hot enough to burn her.
 "Q. Okay. But you're saying she couldn't bend over and do the faucets herself. You had to do that for her?
 "A. Well, she could have if she wanted to. If she'd really wanted to she could have.
"Q. But you normally did that for her?
"A. Right.
 "Q. And you're saying 'I think the water was warm,' you just don't think it was warm enough to burn her?
"A. No, I don't think it was.
 "Q. Did she react at all when it happened that it was warm or felt warm to her?
 "A. No more than usual. You know, occasionally she was saying 'let's turn it a little bit warmer' or 'we'll cut it down a little bit' or 'it's not warm enough' but nothing unusual.
 "Q. Okay. But if I understand right you were the one who had actually put the water in the pan and used it to bathe her, right?
 "A. Well, the water run into the pan and the water in the pan and she's in the tub and the water was just running out of the tub. And she's standing in the water, you know. And the water, the pan and everything in the tub with her.
 "Q. And then I think the water in the pan was used to wash the soap off her leg?
"A. Yeah.
 "Q. And you're the one who would fill up the pan and pour it on her?
 "A. The water was running in the pan. The pan was sitting in the tub. And I'd soap her down and all, I rinsed for her off her feet so the soap wouldn't, so she wouldn't slide, you know. You could say I was the one doing the shower.
 "Q. Right. And if I'm not mistaken you're the one who did the bathing of her, right? She didn't bathe herself?
"A. No.
". . . .
 "Q. Do you remember what day you first told the supervisor?
 "A. No, I don't remember. I don't even remember what month this was.
 "Q. Well, Ms. Gaylard I think, if my notes and dates are right, I think she said it was December 16th that she was burned which would have been on a Wednesday, if my notes are right. Does that sound like it's about the day she indicated . . .? *Page 366 
 "A. She said it happened that Wednesday but she didn't say anything to me that Wednesday. In fact, she didn't say nothing to me about being burned until that Monday, really. That Monday, I think.
 "Q. Did you go over there between the Wednesday she claimed she was burned and the Monday when you say she reported it?
". . . .
 "A. I went Friday and we got a bath that Friday and she said 'I'm, —' oh, she wasn't going to stand in the tub that day, she was just going to sit on — stay in the bed, that's what happened, stayed in the bed that day. She said she believed that water was too hot the day before and she believed her leg was burned and she didn't want her legs to get wet.
"Q. Did you look at her legs that day?
"A. Yeah.
 "Q. Now this would have been the Friday after the Wednesday?
"A. Right.
"Q. Then two days she said she was burned [sic]?
"A. Right.
". . . .
 "Q. So did Ms. Gaylard have anything at all to do with either the regulating of the hot and cold water or filling up the pan or rinsing the soap off her legs?
"A. That day?
"Q. Yes ma'am. Wednesday, the 16th.
 "A. Yeah, some days she would, yeah, she would help regulate the water. She did help me regulate that water some days. Yes, she did. I just remember she did, she would turn it on, turn the cold on and then she would turn the warm on. She would help regulate the water.
"Q. I thought you said she couldn't do that.
 "A. Yes, she did. I just remembered Ms. Gaylard could stand and do that. Cause some days she would do it herself. She would do it. She would get in the tub and she would turn the water on and then I would get the soap and the rag and soap it down real good and put, the water was not even directly on her.
". . . .
 "A. And she would rinse herself. She would rinse her body off herself. I would stand back and she would rinse her own self. The only thing I rinsed off was her feet. Never her legs, not above her ankles."
During Ms. Taylor's deposition and during the trial, she testified that she did not regulate the faucets or the water temperature while attending Ms. Gaylard on Wednesday, December 16. Further, at trial, Ms. Taylor testified that Ms. Gaylard had not complained about the alleged burns until at least the following Monday, December 21.
Oxford filed a motion in limine to prevent Ms. Gaylard from introducing the recorded statement into evidence, citing Rule 4.2, Ala.R.Prof. Conduct:
 "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."
The comment to Rule 4.2 elaborates:
 "In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation [sic] with persons . . . whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. . . .
 "This rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question."
The circuit court granted Oxford's motion in limine, holding that the attorney's action that had resulted in the recorded conversation violated Rule 4.2, Ala.R.Prof. Conduct. Moreover, during the cross-examination of Ms. Taylor by Ms. Gaylard's attorney, the circuit court sustained an objection to the use of a transcript of the recording for impeachment *Page 367 
purposes.[1] In addition, Ms. Gaylard raised the issue in her motion for new trial, which was overruled by the circuit court.
Ms. Gaylard contends that because the recorded conversation occurred before her attorney had any indication that Oxford had retained counsel to represent it in defending any claim that might be filed by Ms. Gaylard based on the alleged December 16 burns, her attorney's actions were not unethical and did not violate the Rules of Professional Conduct. Ms. Gaylard argues that even if the attorney's actions violated Rule 4.2, the rule is an internal bar regulation that should not affect the admissibility of the recorded statement. Thus, Ms. Gaylard maintains that the circuit court's ruling barring the admission of the recorded statement constituted reversible error.
We begin our analysis by first determining if the attorney violated Rule 4.2. That rule applies only to communications with a party, and then only when the attorney knows that the party is represented by an attorney. Although the committee comments to Rule 4.2 indicate that the rule should reach an agent or an employee of a corporate party when the corporation's liability will be predicated on the agent's actions, Oxford itself was not a "party" at the time of the communication, because Ms. Gaylard had not yet filed an action against it. The rules do not require an attorney to immediately file an action at law before communicating with the person with whom the attorney's client has a dispute.
Aside from the question whether Oxford was a party, there is no evidence that Ms. Gaylard's attorney knew, or even had reason to think, that Oxford had retained counsel in regard to the matter of Ms. Gaylard's alleged injury. Notwithstanding the fact that Ms. Taylor initially objected and said that she should not talk to the attorney without talking to her supervisor first, she did not say or imply that her employer had retained counsel. Thus, Ms. Gaylard's attorney could not have violated Rule 4.2. Because this was the only basis on which the circuit court sustained the objection, it was error to sustain the objection, made during cross-examination of Ms. Taylor, to the use of her statement as a prior inconsistent statement.
Even if this communication had occurred after Ms. Taylor had been contacted by attorneys for Oxford, and even if Ms. Gaylard's attorney had known that Ms. Taylor was a "party," it would still have been error for the circuit court to sustain the objection and bar admission of the evidence. The Rules of Professional Conduct are "self-imposed internal regulations" and do not play a role in determining the admissibility of evidence. Stringer v. State, 372 So.2d 378, 382-83
(Ala.Crim.App.), cert. denied, 372 So.2d 384 (Ala. 1979); cf. Terry CoveNorth, Inc. v. Marr Friedlander, P.C., 521 So.2d 22, 23-24
(Ala. 1988) ("The sole remedy is the imposition of disciplinary measures.").
This Court has held repeatedly that the burden is on the appellant to establish that errors committed by the circuit court probably prejudiced him. Abbott v. Allstate Ins. Co.,507 So.2d 905, 908 (Ala. 1987); American Furniture Galleries, Inc.v. McWane, Inc., 477 So.2d 369, 373 (Ala. 1985); Watson v.McGee, 348 So.2d 461, 463 (Ala. 1977).
The circuit court's error in sustaining the objection was not harmless. The jury could have viewed the evidence as presenting essentially a conflict between Ms. Gaylard's testimony and Ms. Taylor's testimony as to whether Ms. Gaylard was scalded in the shower and, if so, how it happened. As to how it happened, Ms. Gaylard contended at trial that Ms. Taylor regulated the water temperature, while Ms. Taylor contended that Ms. Gaylard regulated it. In the first part of her recorded statement, Ms. Taylor said that she had regulated the water temperature: *Page 368 
 "Q. . . . Was she able herself to regulate the faucet and cut on the water and pour it in the pan? Or would you just do it for her?
"A. I was doing it. . . .
 "Q. Okay. But you're saying she couldn't bend over and do the faucets herself. You had to do that for her?
 "A. Well, she could have if she wanted to. If she'd really wanted to she could have.
"Q. But you normally did that for her?
"A. Right."
Although Ms. Taylor later in the conversation asserted that Ms. Gaylard had regulated the temperature of the water herself, the contradictions within the recorded statement simply present a further question for the jury as to which statement by Ms. Taylor it was to believe. The fact that she "corrected herself" later in the conversation does not render the entire recorded statement consistent with Ms. Taylor's trial testimony.
There is also a conflict between the statement and Ms. Taylor's trial testimony regarding when Ms. Gaylard first complained that her legs had been burned in the shower.[2] The alleged scalding would have taken place on Wednesday, December 16. At trial, Ms. Taylor asserted that Ms. Gaylard did not complain of having been burned until the following week on Ms. Taylor's Monday visit, or perhaps later. Oxford sought to prove that Ms. Gaylard did not complain of the alleged burn until well after it had supposedly occurred. In her statement, however, Ms. Taylor stated that Ms. Gaylard complained of the burns the very next visit:
 "A. I went Friday and we got a bath that Friday and she said 'I'm, —' oh, she wasn't going to stand in the tub that day, she was just going to sit on — stay in the bed, that's what happened, stayed in the bed that day. She said she believed that water was too hot the day before and she believed her leg was burned and she didn't want her legs to get wet.
"Q. Did you look at her legs that day?
"A. Yeah.
 "Q. Now this would have been the Friday after the Wednesday?
"A. Right.
"Q. Then two days she said she was burned [sic]?
"A. Right."
Evidence presented by Ms. Gaylard and her daughter indicated that they tried to treat the burns at home, but that they got worse rather than better. In late December, Ms. Gaylard was admitted to a hospital for treatment of second degree burns on her legs. Oxford contended that this condition was not caused by the alleged scalding, but there was substantial evidence, at least from Ms. Gaylard's testimony, that it was. Further, the record does not support a holding, as suggested by Justice Houston's dissent, that sustaining the objection was harmless error because Ms. Gaylard's feet were not burned. This Court is not in a position to make a finding that, because Ms. Gaylard's feet were not burned, her injuries could not have occurred the way she said they did, so the judgment is not due to be affirmed on this ground in spite of the error in disallowing the use of Ms. Taylor's statement.
In short, the conflicts between the testimony of Ms. Gaylard and that of Ms. Taylor were crucial to the jury's resolution of the case. The recorded statement was inconsistent with Ms. Taylor's trial testimony in at least two material respects, and thus it was not harmless for the circuit court to disallow its use for cross-examination of Ms. Taylor. Consequently, the judgment is hereby reversed and the cause is remanded for a new trial.
REVERSED AND REMANDED.
SHORES, KENNEDY, INGRAM, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX and HOUSTON, JJ., dissent.
[1] The circuit court sustained this objection after Ms. Taylor had admitted under oath that, when Ms. Gaylard's attorney contacted her, she had not heard that a legal action had been filed regarding the matter and to the best of her knowledge one had not been filed. She also admitted that at that time she had not talked to any other lawyers. There is no indication in the record that at that time Oxford had retained attorneys to represent it in regard to Ms. Gaylard's claim.
[2] Ms. Gaylard testified that at the time Ms. Taylor emptied the pan onto her legs she said, "Oh my Lord, you've burned me; Dot you've burned me." Ms. Taylor denied that Ms. Gaylard made such a statement. This is simply a direct conflict, and the recorded statement was inconsistent with Ms. Taylor's trial testimony. *Page 369