IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

| | |
|---|---|
| TBC CORPORATION, | Shelby Chancery No. 97909-2 |
| Plaintiff/Appellant, | C.A. No. 02A01-9310-CH-00229 |
| v. | Hon. Floyd Peete, Chancellor |
| GENE WALL, GERALDINE WALL, JOE WALL and HELEN WALL, | |
| Defendants/Third-Party Plaintiffs, | |
| v. | |
| MARVIN BRUCE, | |
| Third-Party Defendant/Appellant. | |

JOHN I. HOUSEAL, JR. and JAMES S. STRICKLAND, JR., Glankler Brown, Memphis, Attorneys for Plaintiff/Third-Party Defendant/Appellants.

THOMAS F. JOHNSTON, PAUL E. PRATHER and STEVEN W. LIKENS, Armstrong, Allen, Prewitt, Gentry, Johnston, & Holmes, Memphis, Attorneys for Defendants/Third-Party Plaintiffs/Appellees.

*REVERSED IN PART AND AFFIRMED IN PART*

Opinion filed:

TOMLIN, Sr. J.

TBC Corporation ("Plaintiff") filed suit in the Chancery Court of Shelby County against Joe Wall, Helen Wall, Gene Wall and Geraldine Wall (collectively "The Walls" or "Defendants") seeking a judgment for an amount due on an account secured by personal guaranties signed by defendants. The defendants filed an answer and a third-party complaint, the latter against Marvin Bruce, plaintiff's president, ("Bruce"), by which they sought indemnification in the event plaintiff obtained a judgment against them. In their answer, the defendants denied that the guaranties were still in effect, and in addition, raised the affirmative defenses of release, waiver, abandonment and estoppel.[1] The answer and third-party complaint also demanded a jury.[2]

_____

[1]For convenience, the major parties will be the only ones hereafter referred to.

[2]While not an issue in this case, the chancellor entered an order denying the jury demand as well as denying the Wall's request for permission to seek an

Plaintiff subsequently filed a motion in limine seeking an order precluding the Walls from: "(1) offering testimony, in violation of the Statute of Frauds, the Parol Evidence Rule and the express terms of the guaranty sued on, seeking to prove an oral modification or termination of the defendants' Guaranty; and (2) offering the testimony of [David Saxon]." The testimony of Saxon was objected to, generally speaking, upon the grounds that he was a "paid witness." We will subsequently explore this allegation in more detail. Following a hearing, the chancellor entered an order denying the motion *in limine* to exclude the testimony of Saxon and granting the motion excluding evidence of the oral modification or cancellation of the written guaranties. The order also held that the Wall's were substantially precluded from offering proof as to the defenses of estoppel, release, abandonment and waiver.

Both plaintiff and defendants filed Rule 9 Applications for Permission to Appeal that portion of the chancellor's order adverse to them.[3] This court granted both applications and designated the defendants to proceed as appellees.

On appeal, each party has presented one issue for our consideration. In its role as appellant, plaintiff contends that the chancellor erred in denying its motion in limine relative to the testimony of the witness David Saxon. The defendants contend that the chancellor erred in ruling that they were precluded from introducing oral and extrinsic evidence to establish estoppel and waiver on the part of plaintiff. For the reasons hereinafter stated, we reverse the trial court's order granting the motion in limine as to defendants presenting

interlocutory appeal. This court subsequently entered an order granting the interlocutory appeal and reversed the chancellor's order denying the Wall's request for a jury.

[3]The chancellor granted permission to seek an interlocutory appeal from his order.

oral and extrinsic evidence pertaining to their defenses of estoppel and waiver and affirm the trial court regarding the testimony of Saxon.

Inasmuch as the two issues presented on appeal are narrow in scope, we will confine our recitation of the facts to those facts that this court considers relevant to these issues.

Prior to this litigation, the defendants owned and operated a company engaged in the sale of tires, batteries and automotive accessories known as Wall Tire Distributors, Inc. ("WTD"). WTD purchased inventory on open account from TBC. In connection with the TBC account defendants individually executed personal guaranties in favor of TBC. The pertinent provisions of these guaranties are as follows:

> FOR VALUE RECEIVED and in consideration of the credit which you may hereafter extend to Wall Tire Distributors, Inc., your customer, the Guarantors hereby guarantee the payment when and as due of any and all present or future indebtedness of any nature to you now owing or hereafter incurred by said customer, including, but not limited to, any such indebtedness arising out of the sale of goods, wares and merchandise sold by you to said customer or by any successor thereof.
>
> If not paid when due, the Guarantors promise to pay said indebtedness on demand.
>
> The Guarantors hereby waive notice of the acceptance of this Guaranty and of credit given or to be given to said customer and hereby consent that without prior notice, (1) the time of payment of such indebtedness or any portion thereof may be extended from time to time after the same becomes due, (2) that any such indebtedness may from time to time be converted from any particular form to any other form and (3) you may surrender or deal with any collateral security or other guaranties, all without releasing or affecting the liability of the Guarantors hereunder. You or your successors and assigns may, at your discretion, proceed hereunder at any time against the Guarantors for all or any part of the amount hereby guaranteed without taking any action against Wall Tire Distributors, Inc., Liquidation of the business to which credit is extended shall not constitute a demand nor shall it be construed or be pleaded as a release from the terms and provisions of this Guaranty.
>
> This Guaranty is an absolute and continuing Guaranty to continue

until you shall receive notice in writing of its revocation, but such revocation shall not in any way relieve the Guarantors from liability for indebtedness contracted prior to the service of such notice.

In addition to the written guaranties TBC also held an inventory lien on all products shipped by it and stored at WTD's place of business.

In 1986, a group of investors formed a company known as Automotive Industries, Inc. ("Automotive") for the purpose of purchasing the tire and automotive parts and accessories business (WTD) from defendants. During the course of the negotiations, representatives of Automotive discussed the sale of WTD with TBC and raised the question of whether or not Automotive would be permitted to maintain the same supplier relationship that then and there existed between TBC and WTD. Automotive advised TBC that it would not be able to provide a personal guaranty on any accounts payable to TBC for merchandise purchased by it from TBC. This condition was accepted by TBC. The sale was to close in December 1986, subject to financing, with the actual transfer of ownership of WTD taking place in April 1987. Following the sale, Joe Wall was employed by Automotive as a salaried "Consultant" to insure the smooth transfer of ownership and provide training to employees of Automotive.

In 1989, Automotive experienced severe cash flow problems resulting in its account with TBC falling into arrears. Ultimately, Automotive filed for bankruptcy in the fall of 1989. At that time, the outstanding balance on this account, while in dispute, approached or exceeded three million dollars ($3,000,000.00). It just so happens that at or about the same time plaintiffs' treasurer discovered the written guaranties of the various defendants, executed in 1976, in a vault in the company headquarters. Plaintiff thereafter filed this suit against defendants for the outstanding balance on the account, relying upon the guaranties in question.

The material facts surrounding the witness David Saxon are as follows. Saxon, a

former employee of TBC, approached defendants, seeking compensation in return for his assistance in proving that TBC had indeed waived and/or abandoned the Walls' personal guaranties. Counsel for the Walls took Saxon's deposition in order to determine whether he had in fact knowledge of any material facts. During the deposition, Saxon testified to the effect that he had no first hand knowledge of TBC's dealings, but rather would assist the Walls in providing investigatory leads, reviewing depositions and identifying documents or other persons who might have knowledge of discoverable information. Saxon entered into an agreement with the defendants' counsel to provide information, in exchange for which he would receive $5,000.00 up front with a fee of $35,000.00 contingent upon the Walls receiving a favorable decision at the trial level. Saxon's own counsel, as well as counsel for the Walls, specifically advised Saxon that he could not be compensated for giving testimony.

During pre-hearing discovery, the Walls requested that TBC provide them with all documents evidencing the release of any security interest securing any debt owed to plaintiff by WTD, Automotive or the Walls. TBC responded that no such documents had been found. Saxon thereafter advised the Walls that he was aware of the existence of a certain document that discussed the release by TBC of certain security interests, including the Walls' personal guaranties. TBC again denied that such a memorandum existed. Thereafter, the Walls' filed Saxon's affidavit in which he stated that such a memorandum did exist. The Walls proceeded to take the deposition of Mr. Charles Quinn, plaintiff's treasurer, who admitted that such a memorandum, dated August 12, 1988, did in fact exist and that he had shown it to Saxon. Quinn further testified that the memorandum was contained in the "old Wall Tire files that were kept in the general file room."

In reviewing the contents of the Wall Tire file, counsel for the Walls found two documents-including Quinn's memorandum-which discussed the release by TBC of certain security interest as well as the Walls' guaranties. One document was an internal memorandum written by Quinn to Marvin Bruce, in which Quinn stated that TBC had

5

given up any personal guaranties used to secure inventory which WTD had previously held. Quinn explains the reasoning behind the memorandum at length in his deposition. Basically, Quinn was giving warning to Bruce that Automotive's financial picture was weakening and that TBC faced an increased risk because they had (1) given up the Walls' personal guaranties and (2) had terminated the inventory liens, the latter being necessary in order for Bank South to make an eleven million dollar ($11,000,000.00) loan, with a first priority inventory lien on the products supplied by TBC. Bank South's loan had enabled Automotive to buy out WTD. Basically, Quinn cautioned Bruce about TBC increasing its involvement with Automotive as a supplier.

The second memo was sent to TBC's insurance carrier and was perhaps the vehicle by which Saxon came to be involved in the entire affair. While an employee of TBC, Saxon served as liaison between TBC and several different insurers concerning TBC's obtaining credit risk insurance on its outstanding accounts receivable portfolio. In this matter, Saxon apparently became familiar with TBC's accounts receivable department and thereby learned about the outstanding inventory held by Automotive.

Saxon however, indicated that there was an earlier document in existence that was not uncovered in the Wall Tire file that further demonstrated that the Walls had been released from their personal guaranties some time earlier than Quinn's memorandum of August 12, 1988. Saxon appears ready to be a material fact witness regarding the existence of a certain document or documents that would demonstrate TBC's release of the Walls' personal guaranties. Saxon stated in his deposition that the August 12, 1988 memo was not the first memo discussing the lack of any personal guaranty on the Automotive/WTD inventory that was outstanding. To the contrary, he contends that an earlier memo serves as further proof that TBC had abandoned the Walls' personal guaranties before August 1988.

I. The "Paid Witness" Issue.

6

Both issues in this case stem from a motion *in limine* filed by TBC and Marvin Bruce in the trial court, seeking to limit the introduction of certain evidence by defendants. More specifically, plaintiff sought to prohibit the introduction of testimony by David Saxon, a non-expert witness, whom plaintiff contended the defendants had paid the sum of $5,000.00 in addition to a contingency arrangement of $35,000.00, dependant upon the outcome of the trial. The chancellor denied this motion,

The sole ground relied upon in the motion by plaintiff was that this arrangement with the witness Saxon was in violation of Disciplinary Rule 7-109(c) of the Code of Professional Responsibility. Our supreme court adopted the Code of Professional Responsibility for the purpose of setting the "ethical standards relating to the practice of law and the administration of law in this court." Disciplinary Rule 7-109(c) of the Code reads as follows:

> A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case. But a lawyer may advance, guarantee, or acquiesce in the payment of:
> (1)Expenses reasonably incurred by a witness in attending or testifying.
> (2)Reasonable compensation to a witness for the loss of time in attending or testifying.
> (3)A reasonable fee for the professional services of an expert witness.

As we have already noted, defendants entered into an agreement with Saxon to compensate him for litigation assistance, such as the review and identification of documents, the identification of other persons who might have knowledge of discoverable information and the review of deposition testimony for any inconsistencies. In addition, defendants' counsel submitted an affidavit to the effect that the payments committed to Saxon were solely for investigatory and consulting services, without any indication that Saxon might become a material witness.

We are of the opinion that this issue may be disposed of without determining whether or not a violation of the Tennessee Code of Professional Responsibility has

taken place. We have been able to find no appellate court decision in this state in point on the civil side of the law, but the Court of Criminal Appeals in State v. Webb, 1993 WL 52815 (Tenn. Crim. App. 1993) considered and disposed of a similar question. In Webb defendant alleged that the trial court had erred in admitting into evidence a voluntary statement obtained from him. Defendant contended that the statement should be excluded because it was obtained by the prosecutor in violation of the Tennessee Code of Professional Responsibility. In rejecting this argument, the Webb court stated that "Even if a violation [of the Code of Professional Responsibility] were present, the violator might be subject to discipline, but the statement would not be excluded on this basis alone."

In Gaylord v. Homemakers of Montgomery, Inc., 675 So.2d 363, 367 (Ala. 1996) the Alabama Supreme Court considered a potential breach of the Alabama Code of Professional Responsibility wherein plaintiff's attorney had communicated with employees of a home health care service that was being sued by plaintiff. That court stated that even if defendants had clearly proven that plaintiff had violated the Code of Professional Responsibility by communicating with a defendant previously represented by counsel, the trial court erred in barring the contents of the conversation from being admitted into evidence: "The Rules of Professional Conduct are ‹self-imposed internal regulations' and do not play a role in determining the admissibility of evidence." *Id.* at 367.


In this state evidentiary rulings are governed by the Tennessee Rules of Evidence. Tenn. R. Evid. 101. An examination of these Rules reveals that no provision has been made for the exclusion of testimony intertwined with an alleged violation of the Code of Professional Responsibility. Under the Rules of Evidence, counsel for Plaintiff will be given ample opportunity on cross-examination with respect to any bias or prejudice on behalf of the witness Saxon. Whether there be a violation of the Code or not, the evidence should not be excluded. Accordingly, we resolve this issue in favor of defendants.

## II. Plaintiff's [TBC] Motion *In Limine*.

Plaintiff, in the same motion, moved the trial court for an order "precluding defendants, at the trial of the above entitled action, from offering testimony, in violation of the Statute of Frauds, the Parole Evidence Rule and the express terms of the guaranties sued on, seeking to prove an oral modification or termination of the defendants' guaranties . . . . "

Following a hearing on the motion *in limine* the chancellor entered an order as to both aspects of plaintiff's motion, which reads in pertinent part as follows:

> IT APPEARING TO THE COURT based upon the motion, the parties' memoranda and supporting authority, including Brewing Corporation v. Pioneer Distributing Co., 194 Tenn. 588, 253 S.W.2d 761 (1952), and statements of counsel, the first part of the motion [«offering testimony, in violation of the Statute of Frauds to the Parole Evidence Rule and the express terms of the guaranties sued on, seeking to prove an oral modification or termination of the defendants' guaranties.'] is well taken and should be granted . . . .
>
> ********
>
> IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the first part of Plaintiff's and Third-Party Defendant's Motion In Limine, to preclude Defendants from offering evidence of oral modification or cancellation of the Defendants' written guaranties in violation of the Statute of Frauds, the Parol Evidence Rule, and the terms of the guaranties, is granted; and
>
> IT FURTHER APPEARING TO THE COURT that the ruling on the first part of the Motion In Limine, on the assertion of Defendants' counsel, appears to substantially preclude Defendants from offering proof as to the defenses of estoppel, release, abandonment and waiver; that the ruling on the second part of the motion involved the contingent payment to a fact witness who claims to have unique knowledge of the subject personal guaranties; and that, if correct, these rulings may be the basis for reversal and new trial after entry of a final judgment.
>
> IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the respective adverse parties are hereby granted leave to take interlocutory appeals from this order and said order entered on September 9, 1994.

One apparent effect of this order, as noted by the court therein, was to preclude defendants from offering any proof pertaining to their defenses of estoppel, release, abandonment and waiver.

9

Defendants contend that the trial court erred as a matter of law in holding that the Statute of Frauds and the Parole Evidence Rule preclude the admission of subsequent oral and extrinsic evidence to establish estoppel and waiver as to Plaintiff. The guaranty in question provides that in order to revoke the guaranties, the guarantee, TBC, must be given notice in writing of the revocation of the guaranties by the guarantor. This admittedly was not done by any of the Walls.

What the Defendants are relying upon and seek to prove by parole evidence is conduct on the part of plaintiff that they contend amounts to either an abandonment/waiver or an estoppel. The appellate courts of this state have recognized that a guaranty can be abandoned and have allowed the presentation of oral testimony to show an abandonment. *See* W.R. Grace & Company v. Taylor, 398 S.W.2d 81, 55 Tenn. App. 227; Ottenheimer Publishers, Inc. v. Regal Publishers, Inc., 626 S.W.2d 276, 279 (Tenn. App. 1981).

Furthermore, both this court and our supreme court have held that parole evidence is admissible to show a waiver of a contractual provision. Goldkist, Inc. v. Pillow, 582 S.W.2d 77, 79 (Tenn. App. 1979); Baird v. Fidelity-Phenix Fire Ins. Co., 178 Tenn. 653, 162 S.W.2d 384 (1942). In Baird our supreme court adopted the following definition of and proof of waiver:

> Waiver is a voluntary relinquishment or renunciation of some right, a foregoing or giving up of some benefit or advantage, which, but for such a waiver, he would have enjoyed. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive.

*Id.*

The Walls have properly pled the defenses of waiver and/or abandonment and estoppel in their answer. By seeking to rely upon these defenses they are not attempting to modify the terms of the guaranties nor do these defenses require an

10

interpretation of the guaranties. For this reason, the Parole Evidence Rule would not apply in our opinion. Stamp v. Honest Abe Log Homes, Inc. 804 S.W.2d 455, 457 (Tenn. App. 1990).

In so ruling, we are not passing upon the admissability of any portion of evidence which may be offered by the Walls. What we are saying, is that under the law of this state they should not be prevented from offering proof in an effort to establish the permissible defenses of estoppel, and waiver/abandonment. It will be the prerogative of the trial court to pass upon the admissibility of any evidence so offered.

In his order, the chancellor relied specifically on the case of Brewing Corp. of America v. Pioneer Distributing Co., 253 S.W.2d 761 (Tenn. 1952). In our opinion, the chancellor's reliance upon Brewing Corporation is misplaced. First of all, the court in Brewing Corporation found that defendant Wilcox, was seeking to prove that he had been released from the written contract of guaranty by a subsequent oral agreement, leaving the contract in force against his co-guarantor and, in addition, that Wilcox was seeking to "alter, modify and contradict" the express terms of the guaranty contract by the introduction of parole evidence, in violation of the Parole Evidence Rule.

We also note that Brewing Corporation was decided prior to the adoption of the Tennessee Rules of Civil Procedure. At the time Brewing Corporation was tried, if defenses of waiver and estoppel were relied upon in an answer, the facts relative thereto to show the occurrence of the events claimed had to be specifically stated with particularity. In Brewing Corporation, following the filing of his answer in which Wilcox undertook to raise the affirmative defenses of estoppel and waiver, plaintiff responded with a motion to strike, which the chancellor treated as a demurrer, the purpose of which was to test the sufficiency of the allegations in the answer. The supreme court held that Wilcox' pleas of waiver and estoppel were insufficient in that they did not show any change of position by him nor injury or prejudice to him, essential elements of estoppel. In other words, these pleadings did not meet the tests that were applicable under the rules of procedure there existing. The rules relative

11

thereto were drastically changed with the adoption of the Rules of Civil Procedure. This issue is resolved in favor of defendants.

The decree of the chancellor as to the issue raised by plaintiff is affirmed. The decree of the chancellor as to the issue raised by the defendants is reversed. This cause is remanded to the Chancery Court of Shelby County for further proceedings not inconsistent with this opinion. Costs in this cause on appeal are taxed to Plaintiff, for which execution may issue if necessary.

_____
TOMLIN, Sr. J.

_____
CRAWFORD, P. J.          (CONCURS)

_____
FARMER, J.          (CONCURS)