BOLIN, Justice.
These parties have been before this Court previously. See Prince v. Poole, 935 So.2d 431 (Ala.2006) (“Prince I ”). Because the facts and procedural history of Pnnce 1 are necessary for a complete understanding of the issues presented by this appeal, we quote extensively from the detailed statement of the facts and procedural history in Prince I, and we use the terms defined therein as defined terms in this opinion:
“Beginning in 1999, 38 individual plaintiffs filed 22 separate lawsuits involving claims for damage allegedly caused by an underground gasoline spill in or near Moundville (‘the Moundville gasoline litigation’). A settlement of *261 those claims was reached in January 2008. This appeal involves a dispute over an alleged fee-sharing or fee-splitting agreement among the attorneys in the Moundville gasoline litigation.
“It is undisputed that Charles E. Pearson of Charles E. Pearson, P.C. (Charles E. Pearson and Charles E. Pearson, P.C., are hereinafter referred to jointly as ‘the Pearson appellants’), and Robert F. Prince of Prince, Poole & Cross, P.C. (Robert F. Prince and Prince, Poole & Cross, P.C., and the successor law firms are hereinafter referred to jointly as ‘the Prince appellants’), were the principal attorneys who prosecuted the Moundville gasoline litigation.
“Poole, a ‘name’ partner in Prince, Poole & Cross, P.C., had an unwritten arrangement with Prince, Poole & Cross, P.C., under which he received 50% of the attorney fees earned from cases that he secured for or referred to the firm. Poole apparently was able to work out this arrangement with Prince, Poole <& Cross, P.C., because of what his brief describes as ‘Poole’s unmatched connections, relationships and influence in the Town of Moundville.’
“Poole contends he first became aware of the claims underlying the Moundville gasoline litigation in early 1996 when, he says, several landowners affected by the gasoline spill contacted him. Poole learned from those landowners that a town meeting concerning those claims would be taking place in February 1996, and he contends that, because he could not attend the meeting, he contacted Prince, Poole & Cross, P.C., to inform the firm of the meeting. Poole argues that by contacting the firm regarding the meeting, he ‘presented’ the Moundville gasoline litigation to the Prince appellants.
“Silas G. ‘Dell’ Cross, Jr., a principal in Prince, Poole & Cross, P.C., attended the February 1996 town meeting, Poole contends, at his request. At that meeting, Cross saw Pearson’s brother, Greg Pearson, who is also an attorney. Cross talked to Greg Pearson and informed him, Poole contends, that Poole had been contacted by several landowners about the gasoline spill, including William B. ‘Buster’ Chandler, whose case eventually became the only Moundville gasoline litigation to go to trial. Thus, Poole argues that he, in effect, also presented the Moundville gasoline litigation to the Pearson appellants.
“Pearson and Prince dispute Poole’s contentions that he presented the Moundville gasoline litigation to them. Prince asserts he first became aware of the claims underlying the Moundville gasoline litigation in February 1996, and Pearson contends he learned of the claims from his brother, Greg. Pearson contends that by the time of the February 1996 meeting, Greg already had been contacted by several landowners, including Buster Chandler, regarding the claims. Pearson testified that after the February 1996 town meeting, Greg told Pearson that he had seen Cross there. Pearson stated that Cross’s presence at the town meeting caused him to assume that Prince, Poole & Cross, P.C., was involved in representing the landowners in the Moundville gasoline litigation.
“Pearson asserts that he contacted Prince to see if Prince would be interested in ‘associating’ to jointly prosecute the Moundville gasoline litigation. Pearson and Prince claim that at some point before July 1996, they orally agreed to associate and to prosecute the Moundville gasoline litigation together, splitting expenses and fees equally. Prince claims that after his initial agree *262 ment with Pearson, he talked with Poole about lowering Poole’s fee percentage from 50% to 33 1/3% for Moundville gasoline litigation cases that Poole had contributed or had referred to the firm. In July 1996, Pearson, Prince, and Poole reached an oral agreement (‘the July 1996 agreement’) regarding the Mound-ville gasoline litigation. The terms of the July 1996 agreement, however, are disputed.
“Regarding the splitting of fees under the July 1996 agreement, Poole claims that he, Prince, and Pearson agreed to ‘pool’ all the Moundville gasoline litigation cases and split the fees equally, regardless of which attorney had contributed or had referred the case. Prince’s deposition testimony on this point is somewhat conflicting. He first testified that the initial agreement was that Poole would receive an equal share of the fees from all of the cases. Prince later explained in his deposition, however, that the parties agreed to that arrangement only because it was understood that Poole would be contributing virtually all of the cases. But, Prince contends, ‘[w]hen Poole failed to carry through with that promise, and other lawyers began bringing cases, the original understanding lost all applicability.’ (Prince’s reply brief, p. 22 n. 16.)
“Pearson’s testimony regarding the July 1996 agreement directly conflicts with Poole’s understanding of that agreement. According to Pearson, he agreed to split fees equally with Prince and Poole only on those cases Poole secured or referred; on cases not secured or referred by Poole, Pearson and Prince were to split the fees 50/50.
“The parties agree that under the July 1996 agreement Poole was not responsible for any of the litigation expenses because Prince and Pearson had agreed to split the costs of the litigation equally. The parties, however, dispute Poole’s obligations under the July 1996 agreement. Poole contends that he had a duty only to ‘refer’ any Moundville gasoline litigation case that came to him, but he claims he had no other obligations under that agreement.
“Prince’s understanding of the July 1996 agreement, however, was that Poole would be contributing virtually all of the Moundville gasoline litigation cases. Similarly, Pearson believed that Poole agreed to contribute Moundville gasoline litigation cases. Pearson also claims that Poole agreed to ‘work’ on the Moundville gasoline litigation. Pearson’s testimony on that point, however, is not very specific; he testified that Poole agreed to ‘handle’ necessary work with the Alabama Department of Environmental Management arising out the Moundville gasoline litigation and that Poole generally agreed to ‘work’ on the Moundville gasoline litigation.
“Eventually, 38 individual plaintiffs signed contingency-fee contracts with either Charles E. Pearson, P.C., or Prince, Poole & Cross, P.C. As mentioned, those 38 plaintiffs filed 22 separate lawsuits. On January 17, 2000, before any of the Moundville gasoline litigation cases had been resolved by trial or otherwise, Poole, Cross, and Fischer left the law firm of Prince, Poole, Cross & Fischer, P.C., and formed a new firm — Cross, Poole & Fischer, L.L.C.
“In an effort to wrap up the dissolution of Prince, Poole, Cross & Fischer, P.C., Prince, Cross, and Fischer executed a written ‘exit agreement’ on January 27, 2000. Among other things, the exit agreement exempted from its coverage the Moundville gasoline litigation. Paragraph 2 of the exit agreement stated that ‘[t]he allocation of revenues, at *263 torney fees and reasonable and necessary case expenses arising out of the [Moundville gasoline litigation would] be addressed by a separate agreement between [Prince, Cross, and Fischer].’
“The exit agreement did not, however, end the dissolution dispute. In particular, the continuing dispute focused on the division of fees from the Moundville gasoline litigation. In a series of letters between Cross, Fischer, and Prince in early February 2000, the conflict escalated to the point that Cross and Fischer accused Prince of breaching the exit agreement because, they alleged, Prince refused to execute a separate agreement pertaining to the Moundville gasoline litigation.
“Prince claims that in an effort to resolve the dissolution dispute, he asked Pearson to make a concession on the fees to which he was entitled from the Moundville gasoline litigation. Pearson agreed to Prince’s request because, Pearson says, the dissolution dispute was interfering with the prosecution of the Moundville gasoline litigation. Through a series of telephone calls and a meeting on February 6, 2000, an oral agreement was reached regarding the division of fees from the Moundville gasoline litigation.
“On February 15, 2000, Pearson sent a letter to Cross, Poole, Fischer, and Prince; each attorney signed it (‘the February 15 letter’). The February 15 letter states:
“‘RE: Fee Splits for Moundville Gasoline Cases vs. Chevron & Plantation Pipe Line
“ ‘Dear Gentlemen:
“ ‘This will confirm the fee splits and other issues that were discussed and generally endorsed by everyone at the end of the day on Sunday, February 6th. The Fee Splits and understanding expressed by this letter agreement are applicable only to the following lawsuits and/or cases: (1) the Chandler et al lawsuits currently filed against Chevron, Plantation Pipe Line, CH2MHÜ1 and Ron Clary (or some combination of said defendants) specifically in regard to the gasoline spill/contamination that originated at the terminal facilities of Chevron and Plantation Pipe Line located on and adjacent to 2nd Avenue in Moundville, Alabama (the “Chevron/PPL 2nd Avenue contamination spill”); (2) such additional lawsuits and/or cases as may be obtained or filed hereafter by any of the undersigned parties for any new or existing clients specifically and only in regard to the said Chevron/PPL 2nd Avenue contamination spill; and (3) any class action filed for protection of the Gordo Aquifer from the gasoline spills that have occurred in the area of the Chevron/PPL 2nd Avenue contamination spill (the “Gor-do Aquifer Class Action”). Cases and/or lawsuits as described in part IV below are expressly excluded from operation of the fee splits set forth below.
“T. Fee Splits
“ ‘James H. Seale 10% .100
Silas G. Cross, Jr. <& Erby J. Fischer 8% of 90% .072
Phil Poole 30% of 90% .270
Bobert F. Prince 26% of 90% .234
[Pearson appellants] and H. Gregory Pearson, P.C. 36% of 90% .324
Total 1.000
“ ‘II. Funding for Costs
“ ‘Charles E. Pearson and Robert F. Prince will continue to advance all (100%) of the funding for costs of litigation for the Chevron/PPL 2nd Avenue contamination spill, as to which costs all of the Fee Splits indi *264 cated above will be subject. Everyone acknowledges and understands that loans and loan costs (including interests and loan fees relating thereto) have been and will continue to be secured and incurred by Charles E. Pearson and Robert F. Prince from a third party bank in their sole discretion for the funding contemplated to cover the costs of the subject litigation. Such loans, interest and loan fees are mutually agreed to be a legitimate cost of the litigation to which all Fee Splits are subject and subordinate. Regardless of allocations (for client purposes) of the foregoing costs of litigation to any particular case, all incurred costs will be repaid and/or reimbursed first (out of first available proceeds of any recovery) before distribution of fees according to the Fee Splits indicated above. Regardless of the outcome of the litigation made the basis of this agreement, it is understood and agreed that there shall be no recourse against Silas G. Cross, Jr., Phil Poole, Erby J. Fischer or Cross, Poole & Fischer, L.L.C. for the recovery of expenses or cost incurred in the prosecution of the litigation. The obligation for cost and expenses in the funding of this litigation shall be borne solely by Charles E. Pearson and Robert F. Prince.
“ Til. Gordo Aquifer Class Action “ ‘The Gordo Aquifer Class Action may be filed by any of the undersigned parties. As among the undersigned parties there shall be two groups. Group “A” shall be composed of Silas G. Cross, Jr., Phil Poole and Erby J. Fischer. Group “B” shall be composed of Charles E. Pearson and Robert F. Prince. Each group shall have the option to participate in any Gordo Aquifer Class Action for up to fifty percent (50%) of the attorney fees generated. A group which chooses to participate shall also be obligated for a proportionate share of the costs and expenses of said litigation. The proportionate share of costs and expenses shall be equal to the fee percentage received by the group. Additionally, any group so participating shall be obligated for their proportionate share of the workload associated with the prosecution of the litigation. A group may elect not to participate, in which event such non participating group’s percentage will then be transferred to the participating group. In the event the Gordo Aquifer Class Action is referred to other attorneys and a non-cost bearing, non-workload bearing referral fee is retained, all of the undersigned parties will have their respective fee split percentages in such referral fee. The provisions of this part III are only applicable to a Gordo Aquifer Class Action and are not applicable to individual cases that seek injunctive relief and/or damages. The provisions of part II above as to Funding for Cost are not applicable to the Gordo Aquifer Class Action.
“ TV. Excluded Cases and Litigation
“ ‘All of the parties to this letter agreement are practicing attorneys. Each party to this letter agreement acknowledges and recognizes the respective rights of the others without obligation hereunder to continue to represent clients, enter into client contracts, and handle client cases and litigation that do not specifically include claims occasioned by the Chevron/PPL 2nd Avenue contamination spill. Any and all client contracts, cases and litigation that do not specifically include claims occasioned by the Chevron/PPL 2nd Avenue contamina *265 tion spill are not subject to the Fee Splits and Funding for Costs provisions of this letter agreement, regardless of whether such claims, contracts, cases and/or litigation involve the same or similar plaintiffs and/or the same or similar defendants. It is acknowledged that there are other possible or existing contamination spills and/or leaks in or near the Moundville area by Colonial Pipeline, Hunt Oil, and Plantation Pipe Line Company that may give rise to claims by some of the same plaintiff landowners that are involved in the Chevron/PPL 2nd Avenue contamination spill. Such other possible or exi[s]ting contamination spills and/or leaks are not subject to the Fee Splits and Funding for Costs provisions set forth above.
“Despite the February 15 letter, however, disagreement regarding the dissolution of Prince, Poole, Cross & Fischer, P.C., continued. In April 2000, Prince exchanged letters with Cross and Fischer regarding an alleged oral agreement by Cross and Fischer to pay Prince for firm-related expenses. The dispute escalated, and in May 2000 Prince filed an action in the Tuscaloosa Circuit Court for a declaratory judgment against defendants Cross, Fischer, Poole, and the law firm of Cross, Poole & Fischer, L.L.C. Among other things, Prince’s complaint sought a judgment declaring that the defendants were in material breach of the exit agreement, the February 15 letter, and any other written and oral agreements between the parties.[1]
“On May 31, 2000, Cross, Fischer, and Poole filed an answer and a counterclaim. They asserted a claim of breach of contract and sought an accounting and a declaration that the exit agreement and the February 15 letter were valid and enforceable agreements that they had not materially breached. The counterclaim also asked the court to determine whether Pearson and Charles E. Pearson, P.C., were necessary and indispensable parties to the declaratory-judgment action.
“On July 5, 2000, Pearson sent a letter to Cross, Poole, Fischer, and Prince (‘the July 5 letter’). In the July 5 letter, Pearson attempted to terminate what he described as the ‘association’ of each of the attorneys by the February 15 letter. The July 5 letter states:
“ ‘It has come to my attention that a contention has been alleged that I should be made a party in your current lawsuit regarding the split-up of Prince, Poole and Cross. I do not understand or appreciate any necessity for me to be involved in your internal affairs, and particularly do not see it as appropriate action for you to involve me, an associating attorney, in your dispute. The Moundville gasoline contamination cases have reached an important point in my effort to get one or more up for trial. The casework on the Moundville cases is time consuming and difficult enough as it is without having to address the contention that has been raised to involve me in your lawsuit. I do not understand why I have been singled out among what must be a number of attorneys who associated either Bob [Prince] or your former P.C. to assist the pursuit of legal claims on behalf of clients. “ T am therefore terminating my earlier association of each of you in regard to my client cases and contracts that are involved in the Moundville *266 gasoline contamination litigation. In particular, I want to make it clear that the association of each of you as may be reflected by my letter of February 15, 2000, in regard to my specific Moundville clients/contracts is hereby withdrawn. As each of you are well aware, my concession of fee percentage reflected in such letter of February 15th was purely a unilateral decision by me to reduce my fee percentage merely in an effort to accommodate Bob, and was not the result of any consideration whatsoever being granted to me by any of you. Other than Bob, no work has been done nor any financial investment made by the rest of you in regard to my Mound-ville clients/contracts since my February 15th letter.
“ ‘My termination of your association pursuant to this letter results in a reversion to the original understanding that I had reached with Phil Poole and Bob (at the outset of the Mound-ville contamination litigation) as to Phil having a referral fee as to certain Moundville cases. Phil and I need to discuss the specifics of the original understanding, but I am proceeding on the basis that the original understanding as to Phil is back in place and I will honor such understanding as to Phil.’
“On August 4, 2000, attorney James Jenkins responded by letter (‘the August 4 letter’) to the July 5 letter. Jenkins wrote the August 4 letter on behalf of Fischer, Cross, and, Poole contends, Poole. The August 4 letter protested Pearson’s interpretation and attempted revocation of the February 15 letter in the July 5 letter. The August 4 letter maintains that ‘[t]he 15 February 2000 letter is an enforceable contract between the parties who signed. The agreement supplants and replaces any previous agreements between my clients’ former firm, Phil Poole individually and [Pearson’s] law firm (and/or [Pearson] individually).’
“On April 11, 2001, Prince, Cross, and Fischer settled their disputes regarding the dissolution of Prince, Poole, Cross & Fischer, P.C. As part of the settlement, Cross and Fischer surrendered any claim to fees from the Moundville gasoline litigation. The settlement resulted in the dismissal of Cross, Fischer, and the law firm Cross, Poole & Fischer, L.L.C., from Prince’s declaratory-judgment action, leaving Poole as the only remaining defendant.
“In October 2001, Prince and Pearson obtained a jury verdict of $43.8 million on behalf of Buster Chandler against Plantation Pipeline Company in the first of the Moundville gasoline litigation cases to go to trial. In a letter to Pearson dated February 15, 2002, counsel for Poole asked whether Pearson would be distributing, in accordance with the February 15 letter, a share of the fee earned on Chandler’s case. Pearson contends this was the first time since the July 5 letter he had been contacted by Poole regarding the Mound-ville gasoline litigation.
“On February 25, 2002, Pearson filed a motion to intervene in the dissolution litigation between Prince and Poole; the trial court later granted Pearson’s motion. Pearson’s complaint in intervention sought a declaratory judgment regarding the validity of the February 15 letter and the nature of his obligations to Poole under the February 15 letter.
“Poole answered Pearson’s complaint in intervention and filed a counterclaim against Pearson and amended his counterclaim against Prince. Poole’s coun *267 terclaims included breach-of-contract claims against Pearson and Prince.[2]
“In October 2002, the trial court ordered the parties to mediate the dispute, but the mediation efforts failed. Pearson and Prince contend that on October 14, during the mediation, Poole learned that confidential settlement negotiations were ongoing regarding the Moundville gasoline litigation. Poole testified at his deposition that on the evening of October 14, he, along with his father and brother, contacted 11 of the plaintiffs in the Moundville gasoline litigation. The Pooles attempted to obtain from those plaintiffs written consents stating that Poole was one of their attorneys in the Moundville gasoline litigation and giving Poole authority to file notices of appearance on their behalf.
“On October 15 and soon thereafter Poole filed notices of appearances on behalf of several of those plaintiffs. In some instances, however, Poole had not been a party to the discussions his father or brother had with the Moundville gasoline litigation plaintiffs, nor had Poole been present when some of the written consents were obtained from those plaintiffs.
“On October 15, 2002, five of the Moundville gasoline litigation plaintiffs who had been contacted by the Pooles signed notarized letters demanding that Poole destroy the written consents the Pooles had obtained on October 14.
“In January 2003, a settlement of the Moundville gasoline litigation was reached. As part of the settlement, each plaintiff signed a written statement that included the following acknowledgment: ‘Robert Prince and Charles E. Pearson represent all Claimants who are Plaintiffs in connection with the Lawsuits and ... neither Phil Poole, Erby Fischer, nor Dell Cross represents any Claimants who are Plaintiffs in connection with the Lawsuits.’ Pearson and Prince did not disburse to Poole any of the attorney fees from that settlement.
“In March 2003, seeking 27% of the fees from the Moundville gasoline litigation, Poole moved for a summary judgment as to his breach-of-contract counterclaim and submitted evidentiary materials in support of his motion. Pearson and Prince responded to Poole’s summary-judgment motion and filed a motion and supporting materials for a partial summary judgment as to Poole’s breach-of-contract counterclaim.[3]
“The trial court afforded the parties several opportunities to submit supplemental evidence in support of their respective motions, and the court held two hearings relating to the pending summary-judgment motions.
“Following Prince’s submission of an affidavit in opposition to Poole’s motion for a summary judgment, Poole moved to strike two parts of the affidavit that, Poole contended, contradicted Prince’s earlier sworn deposition testimony. Poole objected to a portion of Prince’s affidavit in which Prince asserted that Poole had orally agreed to pay for various firm-related expenses. Poole also objected to those parts of the affidavit in which Prince asserted that Poole had assumed and had failed to perform obligations not mentioned in the February 15 letter. Prince filed a response to *268 Poole’s motion to strike, but the trial court granted Poole’s motion.
“During the pendency of the parties’ summary-judgment motions, the trial court, at Poole’s request, ordered Prince and Pearson to produce information regarding the total amount of attorney fees resulting from the settlement of the Moundville gasoline litigation. Following the ⅛⅛1 court’s granting of Poole’s motion to compel the information, Prince and Pearson produced documents, which were placed under seal, showing the total amount of attorney fees.
“The trial court then granted, on January 5, 2004, Poole’s motion for a summary judgment. In a three-page order, the trial court stated, in relevant part:
“ ‘The Court has considered the relevant legal authorities, the parties’ oral arguments, the evidence in the record, and the parties’ written submissions .... Based on its review of these items, the Court finds that there is no genuine issue of material fact as to Poole’s breach of contract count, and Poole is entitled to judgment in his favor on this count as a matter of law....
“‘It is therefore ORDERED, ADJUDGED, and DECREED that Poole’s Motion for Summary Judgment as to His Breach of Contract Count is GRANTED; Pearson’s Motion for Partial Summary Judgment is DENIED; and Prince’s Motion for Partial Summary Judgment, insofar as it applies to Poole’s breach of contract count, is DENIED. Summary judgment is entered in favor of Poole and against Charles E. Pearson, P.C., Charles E. Pearson, Robert F. Prince, The Prince Law Firm, P.C., and The Prince-Patterson Law Firm, P.C., on Poole’s count for breach of contract in the amount of $4,755,644.20 plus prejudgment interest....’”
Prince I, 935 So.2d at 433^42 (footnotes omitted).
Pearson and Prince argued on appeal that they were entitled to introduce parol evidence because, they said, the February 15 letter did not contain a merger clause and was not intended to be a complete integration of the parties’ agreement. Pearson and Prince argued that the parties’ agreement was partly oral and partly written and that the February 15 letter effected only a partial integration of the parties’ agreement and was not intended to be the complete expression of the parties’ agreement. Therefore, Pearson and Prince contended that parol evidence was admissible as to the oral terms of the parties’ agreement. Prince /, 935 So.2d at 433.
Specifically, Pearson and Prince argued that the express terms of the February 15 letter did not place the obligation on anyone to actually prosecute the Moundville gasoline litigation. Thus, Pearson and Prince contended that the terms of the parties’ respective obligations to prosecute the Moundville gasoline litigation were omitted from the February 15 letter and that they were entitled to produce parol evidence as to those terms. Poole responded by arguing that the February 15 letter was an unambiguous contract and, therefore, that parol evidence was inadmissible to vary or add to its terms. Prince I, 935 So.2d at 433.
The parol evidence sought to be introduced by Pearson and Prince suggested that Poole had assumed certain obligations with regard to the prosecution of the Moundville gasoline litigation that were not mentioned in the February 15 letter and that he had failed to perform those obligations. Pearson argued that Poole had agreed to assist in working on the *269 Moundville gasoline litigation and to work to end the dissolution dispute with Prince’s former firm. However, Pearson contended that after the February 15 letter, Poole neither worked on the Moundville gasoline litigation nor worked to end the dissolution dispute.
Prince testified in his affidavit that the February 15 letter was only a part of the parties’ overall agreement and that Poole was to refer new cases in the Moundville gasoline litigation, assist with State agencies, and be available to assist with jury selection and at trial of the Moundville gasoline litigation.[4] However, Prince testified that Poole did not perform any of those obligations after the February 15 letter was written. Prince I, 935 So.2d at 446.
Poole disputed Pearson and Prince’s claims that he assumed obligations other than those expressed in the February 15 letter. Poole contended that he was obligated only to include in the pooled cases any Moundville gasoline litigation that happened to come his way and that there was no evidence indicating that he had breached that requirement. Prince I, 935 So.2d at 446.
In reversing the summary judgment entered by the trial court in favor of Poole, this Court held that the February 15 letter was not a complete expression of the parties’ agreement and did not completely integrate the parties’ agreement because it omitted terms relative to the parties’ obligations to prosecute the Moundville gasoline litigation. Thus, this Court held that Pearson and Prince were entitled to introduce parol evidence as to those omitted terms. Prince I, 935 So.2d at 451.
As for the issue whether Poole had assumed obligations not expressed in the February 15 letter, this Court stated:
“To resolve Poole’s argument regarding his obligations under the February 15 letter in Poole’s favor would necessarily require us to find that the February 15 letter is a completely integrated agreement.
“We, however, have concluded otherwise. Pearson and Prince have presented evidence from which the fact-finder could conclude that the parties’ agreement included Poole’s assuming obligations other than what is expressed in the February 15 letter, such as agreeing to work on the Moundville gasoline litigation, to assist with state agencies in pursuing the Moundville gasoline litigation, or to work to end the dissolution dispute with Prince’s former firm. If the fact-finder were to conclude that Poole had indeed assumed one or more of the additional obligations Pearson and Prince allege he assumed, the fact-finder could also conclude, based upon Poole’s admission that he did ‘nothing’ after the parties executed the February 15 letter, that Poole failed to perform those obligations. A dispute of material fact therefore exists, and summary judgment was inappropriate.”
Prince I, 935 So.2d at 446-47 (footnote omitted). Additionally, this Court concluded that questions of fact existed as to whether the parties intended their agreement to be a referral arrangement or an association arrangement and, if Poole did *270 assume obligations under the parties’ agreement, whether the parties intended Poole’s performance of those obligations to be a condition precedent to his entitlement to fees recovered in the Moundville gasoline litigation. This Court stated:
“Pearson and Prince were entitled to introduce parol evidence on the question whether and to what extent Poole had assumed obligations under the overall agreement between the parties. Finally, Poole’s contention that all of the cases in the Moundville gasoline litigation were to be ‘pooled,’ when coupled with Pearson and Prince’s assertions that Poole had assumed obligations to work on the Moundville gasoline litigation, creates a question of fact — which should be determined by the trier of fact — as to whether the parties’ intended for their agreement to be a referral arrangement or an association arrangement. ...
“... In addition to whether the parties intended for their arrangement to be a referral or an association, there are disputed issues of fact in this case with respect to: (1) whether Poole assumed obligations under the overall agreement among the parties and, if so, what those obligations were; and (2) if Poole indeed assumed obligations under the parties’ agreement, whether the parties intended Poole’s performance of those obligations to be a condition precedent to his entitlement to a percentage of the fees obtained in the Moundville gasoline litigation.”
Prince I, 935 So.2d at 451-52 (footnote omitted). On January 27, 2006, we reversed the summary judgment and remanded the case.

On Remand

On March 14, 2007, Prince moved the trial court for a summary judgment as to Poole’s counterclaims asserting breach of contract, fraud, suppression, breach of a fiduciary duty, and conversion. As to the breach-of-contract claim, Prince argued that Poole could not satisfy the elements of a contract because he could not establish his own performance under the agreement. Prince contended that Poole did no work in connection with the prosecution of the Moundville gasoline litigation after February 15, 2000, and that the Moundville plaintiffs had disavowed him as their counsel. Prince also argued that Rule 1.5(e), Alabama Rules Professional Conduct, pro: hibits Poole from receiving a fee on a case that he has not referred, has not done a proportionate amount of work on, and does not have the consent of the client to participate in. Prince contended that at most Poole was entitled to a quantum meruit recovery only for his contribution to the Moundville gasoline litigation.
On March 28, 2007, Pearson moved the trial court for a summary judgment as to Poole’s counterclaims and also joined Prince’s motion for a summary judgment. Pearson argued in his motion that he was entitled to rescind the alleged February 15 letter agreement based on a failure of consideration by Poole. Pearson also argued that he was entitled to terminate Poole’s association based on the continued fighting between Prince and Poole because it was detrimental to the interests of Pearson and of his Moundville gasoline litigation clients.
On April 18, 2007, Poole responded to Prince’s and Pearson’s motions for a summary judgment. Poole argued, as to the breach-of-contract claim, that the February 15 letter was a valid and binding contract supported by consideration and that he met all of his obligations as to the Moundville gasoline litigation under the February 15 letter. Poole also argued that the February 15 letter did not violate *271 Rule 1.5 of the Alabama Rules Professional Conduct.
Both Prince and Pearson replied to Poole’s response in opposition to their motions for a summary judgment. Pearson also moved the trial court to strike portions of Poole’s affidavit filed in support of his response in opposition to the motions for a summary judgment.
On June 28, 2007, the trial court entered an order granting Prince’s and Pearson’s motions for a summary judgment as to Poole’s counterclaims of promissory fraud, fraudulent suppression, conversion, and breach of fiduciary duty. The trial court denied the motions for a summary judgment as to Poole’s breach-of-contract counterclaim, finding that substantial evidence existed indicating that
“the parties entered into a binding agreement relative to the division of the legal fees generated by the cases in question and that the parties never expected Poole to be a litigator in the underlying action or to help in other unrelated matters which might result in ‘freeing up’ more time for the principal litigators to pursue the underlying claims as appears to have been the agreed upon practice in his association with Prince and others for many years as a ‘non litigator’ and/or a ‘rainmaker.’ ”
On August 17, 2007, Poole moved the trial court for a summary judgment on Pearson’s claim of tortious interference with business relations. On August 31, 2007, Pearson filed a response in opposition to Poole’s motion.
On February 4, 2008, Poole moved the trial court for a summary judgment on his breach-of-contract claim. Poole argued in support of his motion that he had fulfilled the contractual obligations regarding the Moundville gasoline litigation under the February 15 letter; that the February 15 letter is a valid contract supported by consideration; that the February 15 letter complies with Rule 1.5, Ala. R. Prof. Cond.; and that, because the February 15 agreement was an express agreement, any argument based on a quantum meruit recovery must fail. Both Pearson and Prince filed responses in opposition to Poole’s motion for a summary judgment.
On March 31, 2008, Prince moved the trial court for a summary judgment on Poole’s breach-of-contract claim. Prince argued that Poole could not satisfy the elements of a contract because he could not establish his own performance under the agreement. Prince also argued that Poole’s interpretation of the February 15 letter violated the requirements of Rule I.5(e), Ala. R. Prof. Cond., rendering the agreement unenforceable. Additionally, both Pearson and Prince moved the trial court to strike Poole’s affidavit filed in support of his motion for a summary judgment.
On May 8, 2008, Prince supplemented his motion for a summary judgment with this Court’s decision in White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042 (Ala.2008), and argued that the terms • of the February 15 letter were too indefinite because the letter failed to identify or specify the obligations of the parties with regard to who was to perform the work on the Moundville gasoline litigation.
Following a hearing on September II, 2008,[5] the trial court, on October 8, *272 2008, entered a summary judgment in favor of Pearson and Prince on Poole’s breach-of-contract claim and denied Pearson and Prince’s motion to strike Poole’s affidavit. Relying on this Court’s decision in White Sands Group, L.L.C., supra, the trial court concluded that Poole had failed to produce substantial evidence showing that an enforceable contract existed between the parties. As an alternative ground for entering a summary judgment in favor of Pearson and Prince, the trial court concluded that even if a contract existed between the parties, it would be unenforceable as violative of Rule 1.5, Ala. R. Prof. Cond.
Poole appealed following the denial by operation of law of his postjudgment motion. On August 31, 2009, this Court dismissed the appeal as being from a nonfinal judgment and remanded the case to the trial court.[6] On remand, the parties jointly moved the trial court to certify the October 8, 2008, judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. On November 19, 2009, the trial court granted the joint motion and entered an order certifying the October 8, 2008, summary judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. Poole timely filed his notice of appeal on December 22, 2009.

Standard of Review

“ ‘ “This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).” ’ ”
Gooden v. City of Talladega, 966 So.2d 232, 235 (Ala.2007) (quoting Prince I, 935 So.2d at 442, quoting in turn Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004)).

Discussion

1. Law-of-the-Case Doctrine

Poole argues that the law-of-the-case doctrine precluded a determination by the trial court on remand that the parties’ alleged February 15 letter agreement was *273 void for indefiniteness of its terms because, he says, this Court had already determined in Prince I that there were “disputed issues of fact” concerning certain terms of “the parties’ agreement.” Prince I, 935 So.2d at 452. Regarding the law-of-the-case doctrine, this Court has stated:
“We recently discussed the doctrine of the law of the case in Lyons v. Walker Regional Medical Center, Inc., 868 So.2d 1071, 1077 (Ala.2003):
“ ‘ “It is well established that on remand the issues decided by an appellate court become the ‘law of the case,’ and that the trial court must comply with the appellate court’s mandate.” Gray v. Reynolds, 553 So.2d 79, 81 (Ala.1989). If, however, an observation by the appellate court concerning an issue is premised on a particular set of facts, and the nature of the remand is such that it is permissible and appropriate to consider additional facts relevant to the issue, the law-of-the-case doctrine is inapplicable. Quimby v. Memorial Parks, Inc., 835 So.2d 134 (Ala.2002); United States Fid. & Guar. Co. v. Baldwin County Home Builders Ass’n, 823 So.2d 637 (Ala.2001); Blumberg v. Touche Ross & Co., 514 So.2d 922 (Ala.1987); Gonzalez v. Blue Cross & Blue Shield of Alabama, 760 So.2d 878 (Ala.Civ.App.2000).’
[[Image here]]
“ ‘ “Under the doctrine of the ‘law of the case,’ whatever is once established between the same parties in the same case continues to be the law of that case, whether or not correct on general principles, so long as the facts on which the decision was predicated continue to be the facts of the case.” Blumberg v. Touche Ross & Co., 514 So.2d 922, 924 (Ala.1987). See also Titan Indem. Co. v. Riley, 679 So.2d 701 (Ala.1996). “It is well established that on remand the issues decided by an appellate court become the ‘law of the case,’ and that the trial court must comply with the appellate court’s mandate.” Gray v. Reynolds, 553 So.2d 79, 81 (Ala.1989).’
“Southern United Fire Ins. Co. v. Purma, 792 So.2d 1092, 1094 (Ala.2001). In the words of Justice Holmes, the doctrine of the law of the case ‘merely expresses the practice of courts generally to refuse to reopen what has been decided.... ’ Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912).”
Bagley ex rel. Bagley v. Creekside Motors, Inc., 913 So.2d 441, 445 (Ala.2005).
In Prince I, Poole moved the trial court for a summary judgment as to his own breach-of-contract claim. The trial court entered a summary judgment in favor of Poole finding that there was no genuine issue of material fact as to Poole’s breach-of-contract claim and that Poole was entitled to a judgment as a matter of law on that claim. Pearson and Prince appealed from the summary judgment in favor of Poole on the breach-of-contract claim.
In addressing the merits of the summary judgment in favor of Poole on his breach-of-contract claim, this Court stated that the summary judgment was appropriate only if there were no disputed issues of material facts relative to any of the elements necessary to establish a breach-of-contract claim, i.e., “ ‘the existence of a valid contract binding the parties in the action, (2) [the plaintiffs] own performance under the contract, (3) the defendant’s nonperformance, and (4) damages.’ ” Prince I, 935 So.2d at 442-43 (quoting Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995)). Pearson and Prince challenged the trial court’s finding that an enforceable contract *274 existed on the following grounds: (1) consideration and formation, (2) interpretation and parole evidence, (3) performance, (4) equitable issues, and (5) public policy. Pearson and Prince also challenged the summary judgment on two procedural grounds: (1) the denial of Pearson’s motion to strike as untimely Poole’s supplemental submissions in support of his summary-judgment motion, and (2) the trial court’s order granting Poole’s motion to strike portions of Prince’s affidavit. Prince I, 935 So.2d at 443.
In reversing the summary judgment entered in favor of Poole on his breach-of-contract claim, this Court stated:
“Although Pearson and Prince have raised a number of substantive and procedural challenges to the summary judgment in Poole’s favor on the breach-of-contract claim, resolution of this case requires discussion of only two issues: the trial court’s application of the parol-evidence rule and the trial court’s striking of portions of Prince’s affidavit. We conclude that the summary judgment was inappropriate because Pearson and Prince have presented substantial evidence creating a genuine issue of material fact as to the obligations Poole assumed under the parties’ agreement regarding the Moundville gasoline litigation and whether Poole performed those obligations.”
Prince I, 935 So.2d at 443 (footnote omitted; emphasis added). In reaching its conclusion, this Court considered only Pearson’s and Prince’s challenges to the summary judgment based on interpretation, parol evidence, and performance under the contract in order to determine that a question of fact existed as to whether Poole had performed under the February 15 letter, as set out above, which is a necessary element of Poole’s breach-of-contract claim. See Prince I, 935 So.2d at 442. This Court’s finding of the existence of a genuine question of material fact as to a single element of the breach-of-contract claim was sufficient to preclude the summary judgment on the breach-of-contract claim. See Ex parte General Motors Corp., 769 So.2d 903, 909 (Ala.1999). This Court expressly pretermitted discussion of Pearson’s and Prince’s remaining issues challenging the merits of the summary judgment entered on Poole’s breach-of-contract claim, including their challenge based on formation of the contract, which directly relates to whether a valid and binding contract existed between the parties. Prince I, supra.
In its order on remand entering a summary judgment for Pearson and Prince, the trial court concluded that Poole failed to present substantial evidence showing that an enforceable contract existed. Because this Court did not definitively address in Prince I the issue whether a binding contract existed between the parties, the law-of-the-ease doctrine does not preclude the trial court’s determination of that issue on remand. Accordingly, we conclude that the trial court was entitled to consider the issue whether a binding and enforceable contract existed between the parties.

2. Indefiniteness of Contract Terms

We now must determine whether the parties’ February 15 letter is void because of the indefiniteness of its terms. The trial court relied on White Sands Group, L.L.C., supra, in its order entering a summary judgment in favor of Pearson and Prince, finding that Poole had failed to present substantial evidence showing that an enforceable contract existed, because, it reasoned, the terms of the February 15 letter were indefinite. This Court has stated:
*275 “ ‘To be enforceable, the [essential] terms of a contract must be sufficiently definite and certain, Brooks v. Hackney, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991), and a contract that “ ‘leav[es] material portions open for future agreement is nugatory and void for indefiniteness’ ”....’ Miller v. Rose, 138 N.C.App. 582, 587-88, 532 S.E.2d 228, 232 (2000) (quoting MCB Ltd. v. McGowan, 86 N.C.App. 607, 609, 359 S.E.2d 50, 51 (1987), quoting in turn Boyce v. McMahan, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)). ‘A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement.’ 1 Richard A. Lord, Williston on Contracts § 4:21, at 644 (4th ed.2007). ‘In particular, a reservation in either party of a future unbridled right to determine the nature of the performance ... has often caused a promise to be too indefinite for enforcement.’ Id. at 644-48 (emphasis added). See also Smith v. Chickamauga Cedar Co., 263 Ala. 245, 248-49, 82 So.2d 200, 202 (1955) (‘ “A reservation to either party to a contract of an unlimited right to determine the nature and extent of his performance, renders his obligation too indefinite for legal enforcement.” ’) (quoting 12 Am.Jur. Contracts § 66). Cf. Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1440 (7th Cir.1992) (an indefinite term may ‘render[ ] a contract void for lack of mutuality’ of .obligation).
“ ‘Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.’ 17A Am.Jur.2d Contracts § 183 (2004). ‘The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.’ Id. (emphasis added). See also Smith, 263 Ala. at 249, 82 So.2d at 203.”
White Sands, 998 So.2d at 1051. Additionally, in order for an alleged contract to be considered void based on the indefiniteness of its terms, the “ ‘ “[i]ndefiniteness must reach the point where construction becomes futile.” ’ ” Ex parte Conaway, 767 So.2d 1117, 1119 (Ala.2000) (quoting Conaway v. Nickles, 767 So.2d 1116, 1117 (Ala.Civ.App.1998) (Crawley, J., dissenting), quoting in turn Heyman Cohen & Sons, Inc. v. M. Lime Woolen Co., 232 N.Y. 112, 114, 133 N.E. 370, 371 (1921)). “A court will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract.” 1 Richard A. Lord, Williston on Contracts § 4:21 (4th ed.2007). See also Parr v. Godwin, 463 So.2d 129, 132 (Ala.1984)(holding that “the ambiguity created by the incompleteness is subject to clarification and being made certain by parol evidence” where there was obvious intent to enter into a contract).
In White Sands, a developer, White Sands, sought to purchase from Tommy Langan certain lots located in a development known as Pilot Town. Langan owned the property on which Pilot Town was to be developed. White Sands addressed the following letter to Langan:
“ ‘I’m writing to make a formal offer on lots in the Pilot Town subdivision at mile marker 3 off hwy 180 in Fort Morgan.
“‘We are making the offer thru our development company, White Sands Group, L.L.C. in the amount of $85,000 cash on (5) lots 23-27. We are agreeable to making a deposit to show good faith in the project.
“ ‘We are in contact with potential buyers of some of your waterfront lots as *276 well. We propose a 5% compensation to White Sands Group for any successful purchasers of additional lots in the neighborhood.
‘“This offer is contingent on amenities described and discussed previously. They are inclusive of but not limited to a swimming pool with waterfall, community entertainment area, community access to the bay front with a possible pier, neighborhood to be gated, etc.
“ ‘The offer is also contingent on successful subdivision of lots and completion of roadways. It was also expressed that environmental, wetlands delineation, archeological, beach mouse, and all other issues have been addressed which will provide these lots to be buildable thru the normal permitting process. The offer is also subject to our ability to obtain reasonable financing at the completion of the neighborhood.
“ T look forward to hearing from you promptly. Please call me if you have any questions.’ ”
998 So.2d at 1045-46. Upon receipt, Lan-gan penciled in some changes in the third paragraph and struck out the words “with waterfall” in the fourth paragraph. The letter was signed by White Sands’ representative as the purchaser and initialed by Langan as the seller.
Subsequently, a third party, PRS II, submitted to Langan a proposal to purchase all the lots in Pilot Town, including the five lots purportedly contracted to White Sands. The proposal by PRS II came with the stipulation that Langan void the “unenforceable contract to White Sands” and that no lots would be carved out of Pilot Town and sold to other parties. Langan then returned White Sands’ check for $10,000 representing White Sands’ deposit, and informed White Sands that he had decided not to pursue a subdivision for Pilot Town. Thereafter, PRS II received a warranty deed for Pilot Town from Lan-gan that included the lots White Sands had sought to purchase.
PRS II sued White Sands seeking a judgment quieting title to Pilot Town in PRS II and declaring that White Sands had no interest in Pilot Town. White Sands counterclaimed, asserting various claims against various entities, including a breach-of-contract claim against Langan. The trial court entered a summary judgment against White Sands on its breach-of-contract claim and in favor of PRS II on its quiet-title action.
On appeal, this Court identified the dis-positive issue, as framed by the parties, as whether White Sands’ letter to Langan regarding the purchase of the lots located in Pilot Town constituted an enforceable contract. In determining that the letter was not an enforceable contract and affirming the summary judgment on the breach-of-contract claim and the quiet-title action, this Court stated:
“We may, therefore, state the disposi-tive question in this case as whether the parties have ‘so [definitely] expressed their intentions [in the [White Sands] letter] that the court [can] enforce their agreement?’ Beraha, 956 F.2d at 1440-41. The plaintiff bears the burden on this question. State Farm Fire & Cas. Co. v. Williams, 926 So.2d 1008, 1013 (Ala.2005); DeVenney v. Hill, 918 So.2d 106, 116 (Ala.2005). We answer it in the negative.
“Indefiniteness infects the [White Sands] letter in at least two fundamental respects. The first uncertainty is the price ultimately to be paid for the five lots. Although the letter ostensibly offers $85,000 per lot, it expressly leaves open the financial impact of the amenities on the offering price. The offer was made ‘contingent on’ the future construction of unspecified amenities, such *277 as, ‘but not limited ío[,] a swimming pool, community entertainment area, community access to the bay front with a possible pier, neighborhood to be gated, etc.’ (Emphasis added.)
“Even were we to assume, as [White Sands] insists we do, that the entire catalog of amenities could properly be ascertained by parol evidence, more difficult questions remain, such as whether any of the amenities were to be constructed by the prospective buyers as part of White Sands’ purchase price, or solely by the sellers, and, if by the sellers, whether the cost of such construction would be reflected in an adjustment of the base offering price of $85,000. The difficulty is illustrated in the October 11, 2004, letter from the Langans to [White Sands], which expressly contemplated ‘some additional cost to the lots’ and an adjustment of the ‘total lot cost,’ due, in part, to the unexpected damage from Hurricane Ivan in September 2004. Thus, the total price for the lots is effectively left open in the [White Sands] letter.
“The second uncertainty presented by the [White Sands] letter is even more difficult and fundamental. The problem is that no party involved in this transaction has, at any time, unequivocally committed — in writing or otherwise — to perform any of its essential terms. White Sands agreed to pay only after the construction of various amenities and after the ‘successful subdivision of lots and completion of roadways.’ However, the letter contains no commitment by anyone to build any amenities or roadways. It is undisputed that the Langans never submitted a final subdivision plat to the Baldwin County Planning and Zoning Commission for approval, but the [White Sands] letter contains no commitment by the Langans to do so or to proceed at all with plans to subdivide Pilot Town. Because the [White Sands] letter left essential aspects of the transaction ‘open for future agreement’ and negotiation, Miller [v. Rose ], 138 N.C.App. [582,] at 588, 532 S.E.2d [228,] at 232 [ (2000) ], and left to the Langans an ‘unbridled right to determine the nature of [their] performance,’ it was ‘too indefinite for enforcement.’ [1 Richard A. Lord,] Williston [on Contracts § 421], at 647-48 [ (4th ed.2007) ].
“The proposals penciled into the initial offer by Tommy Langan, whether or not they are considered a ‘counteroffer’ as [White Sands] contends, did not transform the [White Sands] letter into an enforceable contract. Even if the proposals were intended to be a counteroffer, they could not have formed the basis for an enforceable contract. This is so because simply proposing modifications to the largely immaterial third paragraph and deleting the words ‘with waterfall’ from the fourth paragraph did nothing to eliminate the indefiniteness that is fatal to the [White Sands] letter. 17A Am.Jur.2d Contracts § 183 (2008) (‘Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.’). More specifically, they did nothing to resolve issues surrounding the financial impact of the amenities on the offering price and certainly did not amount to a definite commitment by the Langans to proceed with plans to subdivide Pilot Town. We hold, therefore, that the [White Sands] letter is unenforceable for lack of definiteness.”
White Sands, 998 So.2d at 1051-53.
As discussed in detail above, Pearson and Prince argued in Prince I that the February 15 letter was not intended to be a complete integration of the parties’ *278 agreement. This Court noted that the February 15 letter accomplished only a partial integration of the parties’ agreement because it reduced to writing the parties’ agreement as to the only four issues it addressed: (1) fee-split percentages for the Moundville gasoline litigation, (2) funding for the costs associated with prosecuting the Moundville gasoline litigation, (3) division of the potential fees and expenses from the “Gordo Aquifer Class Action,” and (4) those cases that explicitly were not subject to the “Fee Splits” and “Funding for Costs” provisions of the February 15 letter. 935 So.2d at 445. As argued by Pearson and Prince, this Court noted that the February 15 letter, by its express terms, failed to place an obligation on anyone to prosecute the Moundville gasoline litigation. Pearson and Prince argued, and this Court agreed, that the terms of the parties’ respective obligations to prosecute the Moundville gasoline litigation were omitted from the February 15 letter and that Pearson and Prince, were entitled to introduce parol evidence as to those terms. Prince I, 935 So.2d at 445-46. In determining that Pearson and Prince were entitled to introduce parol evidence as to the parties’ obligations to prosecute the Moundville gasoline litigation, this Court stated:
“‘The applicability of the parol evidence rule necessarily rests upon the existence of a valid written instrument that completely and accurately expresses the obligations assumed by or imposed upon the parties. The very purpose of the parol evidence rule is to protect the verity of such an instrument. As noted by this Court in Hibbett Sporting Goods, Inc. v. Biernbaum, 375 So.2d 431, 434 (Ala.1979), quoting Sellers v. Dickert, 185 Ala. 206, 213, 64 So. 40, 43 (1913), “[t]he implication, at least, is that the executed writing contains all stipulations, engagements and promises the parties intend to make or to assume, and that all previous negotiations, conversations, and parol agreements are merged in the terms of the instrument.” In other words, the parol evidence rule does not apply to every contract of which there exists written evidence; it applies, instead, only when the parties to an agreement reduce it to writing, and agree or intend that the writing shall be their complete agreement. Biernbaum, supra at 434, citing 3 Williston, Contracts, § 633.’
“First Commercial Bank v. Spivey, 694 So.2d 1316, 1326-27 (Ala.1997).
[[Image here]]
“... [W]here it is clear that a written instrument was not intended to reflect the full agreement of the parties, the [parol-evidence] rule allows parties to present additional facts not contained in the instrument for the purpose of supplementing the terms set out in the writing. The case for parol evidence is most clear-cut where the document, on its face, indicates an omission of terms. Thus, .... clear and obvious omissions in deeds have been the basis for allowing parol evidence where an instrument contained an ‘indefinite’ description of real property, or where ‘valuable consideration’ was recited, but not a specific consideration.”
Prince I, 935 So.2d at 444-46.
As noted in Prince I, Pearson testified in his deposition that Poole agreed to assist in working on the Moundville gasoline litigation and to work to end the dissolution dispute with Prince’s former firm. Prince testified in his affidavit that “Poole was expected to refer new cases relating to the Moundville gasoline spill, assist with state agencies, and be available to assist *279 with jury selection and at trial” of the Moundville gasoline litigation cases. Poole disputed Pearson’s and Prince’s contention that he had assumed obligations other than “to include in the pooled cases any Mound-ville gasoline cases that came his way.”
On remand, Pearson presented parol evidence in the form of his affidavit, in which he testified:
“It was my understanding that all associated attorney’s [sic] who were receiving shares of the contingency fees would each do their full share of the remaining legal work that was necessary. ...
“[T]he February 15 letter was only a part of the association agreement. The February 15 letter did not address Poole’s (or any of the attorneys’) work obligations that was an essential part of the overall association agreement. Pri- or to and at the time of the February 15 letter, it was my understanding from (a) my prior discussions with Poole, (b) from Poole’s course of conduct in actually having done previous work on the cases while employed at the Prince law firm, and (c) from communications made to me by his new partners that they and Poole would continue to work on the cases he was being associated on just like all the other attorneys were expected to do. Poole had furthermore told me and agreed in previous discussions that he would work on the Moundville eases, that he would work in helping handle clients, that he would assist with state agencies (notably the Alabama Department of Environmental Management) in pursuing the Moundville cases, and that he would be present and assist at trial in regard to jury selection and the clients.”[7]
Poole also presented parol evidence by way of his affidavit, in which he testified:
“At the time of, and following execution of, the February 15, 2000, letter agreement, I agreed to continue to meet all of my duties and responsibilities relative to the ‘Moundville gasoline cases’: (a) I had earlier agreed that whatever Moundville contamination cases came to me I would bring into the firm and place in the ‘pool’ of cases with which we were all associated. I renewed that pledge and obligation for the period following the execution of the February 15, 2000, agreement; (b) I had earlier agreed that I would assist, in any way I was asked, with contact and communication with Alabama state agencies in Montgomery, such as ‘ADEM’ or the Oil and Gas Board, and based on my familiarity with State government and agencies. I renewed that pledge and obligation for the period following the execution of the February 15, 2000, agreement; and (c) I had earlier agreed, as Bob Prince has said, to ‘be available to assist with jury selection and at trial.’ I renewed that pledge and obligation for the period following the execution of the February 15, 2000, agreement ....”[8]
We find the facts of White Sands to be distinguishable from the facts in this case. In this case the evidence clearly indicates that the parties intended to enter into a contract with regard to the Moundville gasoline litigation and that the February 15 letter memorialized part of that agree *280 ment. Although the February 15 letter is silent as to the parties’ obligations with regard to prosecuting the Moundville gasoline litigation, Pearson and Prince have contended, and the evidence indicates, that the parties had reached an oral agreement as to the terms of the parties’ obligations to prosecute the Moundville gasoline litigation. Because the parties have indicated an intention to contract, parol evidence is admissible to clarify the omitted terms. Par?" supra. Although the parties have presented disputed evidence as to what the actual terms regarding their obligations to prosecute the Moundville gasoline litigation are, that dispute does not render the terms of the February 15 letter so indefinite “that construction becomes futile.” Ex parte Conaway, 767 So.2d at 1119. Rather, it simply creates a question of fact for a jury to determine.
Further, unlike the parties in White Sands, it does not appear from the evidence that the parties left essential terms “open for future agreement.” White Sands, 998 So.2d at 1052. The evidence indicates that here the parties did not leave open for future agreement the parties’ obligations with regard to prosecuting the Moundville gasoline litigation; they simply disagree as to the terms of those obligations. Additionally, unlike the circumstances in White Sands, there is no evidence indicating that the February 15 letter or any other agreement of the parties left Poole with the “unbridled right to determine the nature of his performance.” It appears from the evidence that Poole had certain obligations with regard to the Moundville gasoline litigation; however, the parties are in dispute as to the terms of those obligations.
Accordingly, we conclude that the terms of the parties’ agreement as to Poole’s obligations regarding the Moundville gasoline litigation are not so indefinite as to render the parties’ agreement void and unenforceable. The trial court erred in entering a summary judgment in favor of Pearson and Prince on Poole’s breach-of-contract claim based on indefiniteness of the contract terms.

3. Rule 1.5(e), Alabama Rules of Professional Conduct

Poole next argues that the trial court erred in finding the parties’ agreement unenforceable based on an alleged violation of Rule 1.5(e), Ala. R. Prof. Cond. Rule 1.5(e) addresses the division of a fee between lawyers who are not in the same firm. The rule provides:
“(e) A division of fee between lawyers who are not in the same firm, including a division of fees with a referring lawyer, may be made only if:
“(1) either (a) the division is in proportion to the services performed by each lawyer, or (b) by written agreement with the client, each lawyer assumes joint responsibility for the representation, or (c) in a contingency fee case, the division is between the referring or forwarding lawyer and the receiving lawyer;
“(2) the client is advised of and does not object to the participation of all the lawyers involved;
“(3) the client is advised that a division of fee will occur; and
“(4) the total fee is not clearly excessive.”
The Scope to the Rules of Professional Conduct states, in part:
“Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a *281 basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer’s self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.”
(Emphasis added.) The power to declare a contract void based on a violation of public policy “ ‘is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.’” Milton Constr. Co. v. State Highway Dep’t, 568 So.2d 784, 788 (Ala.1990) (quoting 17 Am Jur.2d Contracts § 178 (1964)). “‘The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain.... [T]he courts will not declare an agreement void on the ground of public policy unless it clearly appears to be in violation of the public policy of the state.’ ” Id. (emphasis omitted).
In Terry Cove North, Inc. v. Marr & Friedlander, P.C., 521 So.2d 22 (Ala.1988), the plaintiffs sued a law firm and its two attorneys, alleging, among other things, breaches of certain Disciplinary Rules (the predecessor to the Alabama Rules of Professional Conduct). The trial court entered a summary judgment in favor of the defendant attorneys on the counts premised on the alleged breach of the Disciplinary Rules. In affirming the summary judgment, this Court stated:
“The Alabama courts, state and federal, have never addressed the issue of whether a breach of a Disciplinary Rule under the Code of Professional Responsibility provides the basis for a private cause of action. However, courts in other jurisdictions which have confronted this issue have expressly held that a violation of a Disciplinary Rule does not create a private cause of action. Tew v. Arky, Freed, Stearns, Watson, Greer, Weaver, & Harris, P.A., 655 F.Supp. 1573 (S.D.Fla.1987); Bickel v. Mackie, 447 F.Supp. 1376 (N.D.Iowa 1978), aff'd mem., 590 F.2d 341 (8th Cir.1978); Noble v. Sears, Roebuck & Co., 33 Cal.App.3d 654, 109 Cal.Rptr. 269 (1973); Spencer v. Burglass, 337 So.2d 596 (La.App.1976), writ denied, 340 So.2d 990 (La.1977); Martin v. Trevino, 578 S.W.2d 763 (Tex.Civ.App.1978); Bob Godfrey Pontiac, Inc. v. Roloff, 291 Or. 318, 630 P.2d 840 (1981); Tingle v. Arnold, Cate, & Allen, 129 Ga.App. 134, 199 S.E.2d 260 (1973); Brainard v. Brown, 91 A.D.2d 287, 458 N.Y.S.2d 735 (1983). We find these cases to be dis-positive in deciding the case at bar. The Code of Professional Responsibility is designed not to create a private cause of action for infractions of disciplinary rules, but to establish a remedy solely disciplinary in nature. Bob Godfrey Pontiac, Inc. v. Roloff supra.”
521 So.2d at 23. See also Ex parte Toler, 710 So.2d 415 (Ala.1998)(holding that a violation of the Rules of Professional Conduct may not be used as evidence and citing Terry Cove North for the proposition that the sole remedy for a violation of the Rules of Professional Conduct was the imposition of disciplinary measures); Gaylard v. Homemakers of Montgomery, Inc., 675 So.2d 363, 367 (Ala.1996) (holding that the “Rules of Professional Conduct are ‘self-imposed internal regulations’ and do not play a role in determining the admissi *282 bility of evidence” and citing Terry Cove North for the proposition that the sole remedy for a violation of the Rules of Professional Conduct was the imposition of disciplinary measures); Baker v. Baker, 862 So.2d 659, 663 (Ala.Civ.App.2003) (holding that a breach of the Rules of Professional Conduct would not justify setting aside a divorce judgment and citing Terry Cove North for the proposition that the sole remedy for a violation of the Rules of Professional Conduct was the imposition of disciplinary measures), and B.W.T. v. Haynes & Haynes, P.C., 20 So.3d 815 (Ala.Civ.App.2009)(recognizing that the legislature has committed to the State Bar the sole authority to enforce Rule 1.5, Ala. R. Prof. Cond., and holding that the trial court lacked subject-matter jurisdiction in a declaratory-judgment action seeking a declaration as to the validity and enforceability of a contingency-fee agreement where the State Bar was not made a party to the action).
We conclude that the trial court erred to the extent that it determined the parties’ agreement to be unenforceable as violative of Rule 1.5(e), Ala. R. Prof. Cond. As discussed in the Scope of the Alabama Rules of Professional Conduct and in the above-cited authorities, the sole remedy for a violation of Rule 1.5(e) is disciplinary in nature; therefore, the trial court lacked the authority to declare the parties’ agreement unenforceable as violative of Rule 1.5(e).

Conclusion

The trial court erred in holding that the parties’ agreement reflected in the February 15 letter was void because the terms were indefinite and that the parties’ fee arrangement violated Rule 1.5(e), Ala. R. Prof. Cond. The summary judgment in favor of Pearson and Prince on Poole’s breach-of-contract claim is reversed, and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
LYONS, WOODALL, SMITH, PARKER, and SHAW, JJ., concur.
COBB, C.J., recuses herself.

. Prince amended his complaint on February 13, 2001, to assert claims of suppression, promissory fraud, fraud, deceit, and conspiracy-

. Poole also asserted claims of promissory misrepresentation, suppression, conversion, and breach of fiduciary duty.

. Also in March 2003, Pearson amended his intervenor complaint to assert a claim of tor-tious interference with business relations against Poole.

. The trial court struck portions of Prince's affidavit containing his contentions that Poole had assumed certain obligations relative to the prosecution of the Moundville gasoline litigation not found in the express terms of the February 15 letter. However, in Prince I this Court reversed that portion of the trial court’s order striking those portions of Prince’s affidavit in which he claimed that Poole had assumed certain obligations not expressly stated in the February 15 letter.

. The record does not reflect that Pearson filed a second written motion for a summary judgment. However, Pearson did argue in favor of a summary judgment at the September 11, 2008, hearing. The trial court conducted the hearing and the parties argued as if each party had filed cross-motions for a summary judgment. Poole did not object at *272 the hearing to the absence of a filed written motion and argued in response to Pearson’s oral arguments in support of a summary judgment. Accordingly, we consider Poole to have waived any objection that he may have had to the absence of written notice of Pearson's motion for a summary judgment. See Holleman v. Elmwood Cemetery Corp., 295 Ala. 267, 327 So.2d 716 (1976).

. The trial court’s judgment failed to adjudicate certain claims Prince and Pearson had asserted against Poole.

. It does not appear that Prince presented any additional testimony on remand. His pri- or affidavit was discussed at length in Prince I.

. Pearson and Prince moved the trial court to strike portions of this affidavit because those portions were inconsistent with prior sworn testimony. It does not appear from the record that the trial court ever ruled on that motion.