[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10444
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 11, 2011
JOHN LEY
CLERK

D.C. Docket No. 2:09-cv-00041-JHH

NIHON RUFUTO CO., LTD.,

                                                                    Plaintiff-Appellant,

                                    versus

NIDEK MEDICAL PRODUCTS, INC.,

                                                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 11, 2011)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Nihon Rufuto Co., Ltd., ("Nihon Rufuto") appeals the

district court's order granting summary judgment to Defendant-Appellee Nidek

Medical Products, Inc. ("Nidek") on Nihon Rufuto's breach of contract claim under Alabama law. After review, we affirm.

## I. FACTS

### A. Unity Project Business Proposal

Plaintiff Nihon Rufuto, a Japanese company, imports medical equipment from the United States and Europe. In early 2002, Nihon Rufuto approached Defendant Nidek, an Alabama corporation, about designing and developing an oxygen concentrator. Nihon Rufuto wanted an oxygen concentrator similar to the Mark 6 oxygen concentrator that Nidek had developed for Koike Medical for the Japanese market. However, Nihon Rufuto wanted its oxygen concentrator to be smaller and quieter, with less power consumption. The parties referred to the project as the "Unity Project."

On April 19, 2002, Nidek sent Nihon Rufuto a business proposal that outlined the Unity Project, but noted that each company's contributions were still "to be discussed." Nihon Rufuto's contributions would include, inter alia, funding the development costs, defining product specifications and coordinating third party testing and regulatory approvals (with Japan's Ministry of Health). Nidek's contributions would include, inter alia, agreeing with Nihon Rufuto's product specifications and project goals, preparing quality measures with Nihon Rufuto's

2

agreement, contracting with a noise consultant and an industrial design firm and working with Nihon Rufuto's engineers to improve system performance.

The business proposal contained a list of specifications and other product requirements. The specifications included an oxygen flow of three liters per minute; an oxygen concentration of greater than ninety percent;[1] a weight of less than 32 kilograms; a noise level of 37 A-weighted decibels in an ordinary room and 32 A-weighted decibels in an anechoic chamber; power of less than 260 watts "at 100v 50Hz" and less than 300 watts "at 100v 60Hz"; and meeting standard "IEC 601-1 or applicable JQA standard." The concentrator would have four casters for mobility and an outlet pressure of 5 Psig. The molecular sieve would be "Oxy Sieve 7 or MDX." The compressor would be a "Thomas 32 stroke." The cabinet construction and system alarm, however, were still "[t]o be discussed."

## B.     Condensed Project Plan and Budget

On May 8, 2002, Nidek's president, Anand Chitlangia, sent a letter to Nihon Rufuto's president, Tadao Ichida, containing a "condensed project plan and budget" prepared by Nidek for the "OEM Concentrator" project, i.e., the Unity Project. Chitlangia's letter stated, "Although, as a result of our meeting, we have

_____

[1]The parties later agreed on an oxygen concentration of ninety percent, plus or minus three percent.

[a] basic understanding of your requirements, we are sure that as we progress towards this project, we will have some questions, which may change the scope of our proposal." Nidek's Chitlangia expressed "hope that these questions will be resolved in the next few meetings."

Nidek's Chitlangia's letter explained that "[i]n the meantime, [Nidek] ha[d] made certain assumptions" in developing its project plan. Nidek's project plan divided the Unity Project into phases with Nidek coordinating "the engineering and design effort" with support from Nihon Rufuto's business and technical staff. Chitlangia's letter outlined ten "broad categories" of items left open for either future agreement between the parties or for future contracting with third party consultants, including an industrial design firm, a sound control consultant, electronic design consultant and a tooling supplier:

1. Specific agreement with Nihon Rufuto for product specifications and project goals.
2. Preparation of quality measures for product and agreement with Nihon Rufuto.
3. Contracting with an industrial design firm for the purpose of preparing [sic] that meets the project goals. This will include ergonomic, appearance and packing requirement and other elements associated with the product and support as required for preparing test models & prototypes.
4. Contracting the services of a sound Control consultant at the early stages of the product design.
5. Contracting with an electronic design consultant for the purpose of verifying electronic functions and preparation

4

of a printed circuit board that would consolidate all electronic functions including the Oxygen Monitoring System & system alarms.
6. Contracting with a tooling supplier for the preparation of necessary tooling.
7. Preparation of manufacturing processes and procedures in agreement with Nihon Rufuto.
8. Preparation of quality procedures and documents with agreement with Nihon Rufuto.
9. Preparation of suitable manufacturing & assembly area.
10. Support to Nihon Rufuto engineers for the purpose of securing regulatory approvals.

Although Chitlangia's letter states that the project is divided into five phases, the

attached budget listed only four phases, as follows:

PHASE I     COMPONENT REVIEW & SELECTION
          COST: $22,500 PLUS EXPENSES*
PHASE II    INDUSTRIAL DESIGN
          COST: $43,500 PLUS EXPENSES*
PHASE III   TOOLING DESIGN
          COST: $31,000 PLUS EXPENSES*
PHASE IV   PRE-PRODUCTION PILOT
          COST: $16,000 PLUS EXPENSES*

*EXPENSES: ALL OUT OF POCKET EXPENSES RELATED TO THIS PROJECT INCLUDING TRAVEL EXPENSES, COST OF 10 ALPHA PROTOTYPES, INDUSTRIAL DESIGN CHARGES, FEES FOR NOISE & ELECTRONIC DESIGN CONSULTANT, TOOLING COST AND COST OF 100 PROTOTYPES.

WE ESTIMATE THE TOTAL OF ALL EXPENSES TO BE $220,000 THIS CAN BE REDUCED IF NIHON RUFUTO CO., LTD., WILL REQUIRE ONLY FEW PRE-PRODUCTION UNITS INSTEAD OF

ESTIMATED 100 UNITS.

The sums in the four phases total $113,000, but Nidek also would be reimbursed for out of pocket expenses, including any sums paid to the numerous consultants. Both Chitlangia and Ichida signed the May 8, 2002 letter.

**C.  Email With Target Completion Dates**

On May 25, 2002, Chitlangia sent Ichida an email regarding the "OEM Proposal" that listed seven general tasks with ballpark dates for their completion:

> 1. We would need a written acceptance of our proposal by you.  It can be done either by you signing our proposal sent to you and returning it to us or by you sending us a letter stating your acceptance. - End of May
> 2. Upon receipt of the above, we will contract with the design firm for the purpose of creating few (between 3 and 6) designs.  We will forward these to you for your review. - Mid June
> 3. With your input, we will select one of the above as a final design. - - 3rd week of June
> 4. The next step will be to create a schematic of the entire machine, detailing the position of the components inside the machine. - -  1st week of July
> 5. Upon approval of that from you, we will then proceed to make prototype parts and then two(2) prototypes.  One will be retained at our factory to run tests and collect data and the second will be shipped to you for your engineers to run tests and collect data. - - End of July
> 6. This way we can compare the results and make changes as required. - - 1st week of August
> 7. After all the changes are made then we will build one more prototype and collect data which then can be submitted to MOH of [sic] approval. - - End of August

Chitlangia's email stated, "Assuming that everything proceeds without any major

6

glitches, we will then be ready to order tooling in September." With regard to payment, Chitlangia's email added that to proceed, Nidek would need some up-front payment:

> 1. A retainer fee of $20,000 which will be adjusted at the completion of the project.
> 2. A payment of $33,000, which represents 50% of the amount stated in our proposal for Phases I and II.
> 3. A payment of $33,000 which will represent the balance of the amount stated in our proposal for Phases I and II.
>
> NOTE: ALL OUT OF POCKET EXPENSES WILL BE BILLED TO YOU AT THE END OF EACH MONTH. YOU WILL BE ADVICED [SIC] AND YOUR PERMISSION WILL BE REQUESTED PRIOR TO MAKING ANY MAJOR EXPENSES - IN SOME CASES THE ESTIMATED AMOUNT WILL BE GIVEN WITH A DEFINITE 'NOT TO EXCEED' LIMITS.

Ichida signed the email. From May 2002 to September 2002, Nihon Rufuto paid Nidek $129,350 for Nidek's work on the oxygen concentrator.[2]

## D.     Changes to First and Second Prototypes

In October 2002, at a trade show in Atlanta, Nidek presented Nihon Rufuto with a prototype of the oxygen concentrator. Nihon Rufuto was pleased with the prototype, but asked for some changes, including, inter alia, changes to the control panel, the positioning of a "cannula hook suction cup" and a "patient humidifier

---

[2]We could locate no breckdown in the record of what part was for Nidek's work and what part was for expense reimbursement for consultants.

7

bottle." According to the notes of Paul Holman, Nidek's project manager on the Unity Project, Nidek was to "continue to work on reducing component/unit vibration and noise" and, to that end, would "investigate the possibilities of reducing the tank boot intake size."

Between the end of 2002 and the Spring of 2003, Nidek revised the prototype based on Nihon Rufuto's comments. In March 2003, Nidek sent a second prototype to Nihon Rufuto in Japan. In an email acknowledging receipt of the revised prototype, a Nihon Rufuto employee stated that the revised prototype was impressive and that President Ichida was "very happy about this workmanship."[3] The Nihon Rufuto email: (1) discussed changes to the location of the oxygen outlet and to the cannula check light, and (2) advised that Nihon Rufuto would "finish revising" and return the prototype to Nidek.

## E.     2003 Change to Five Liter Compressor

Throughout the rest of 2003, Nihon Rufuto asked Nidek for even more changes. One significant change was from a three liter compressor to a five liter compressor. The five liter compressor increased the size of the motor, generated more noise, used more wattage and required some different parts. At Nihon

---

[3]In his deposition, Ichida explained that in this email he meant only that he was pleased with the way the prototype looked and that he had not yet had a chance to evaluate whether the prototype met the specifications.

Rufuto's request, Nidek worked on designing models with a three liter compressor and with a five liter compressor. Nihon Rufuto also asked for a redesign of the oxygen monitoring system board and tweaks to the cabinet design. At a July 2003 meeting in Birmingham, Nihon Rufuto inspected the three liter and five liter compressors. By January 2004, Nihon Rufuto planned to submit first the three liter model to Japan's Ministry of Health and follow with the five liter model.

In March 2004, Nidek shipped another three liter prototype with a 32 stroke compressor to Nihon Rufuto. After testing that prototype, Nidek determined that it met the oxygen purity, noise and wattage requirements. Nihon Rufuto's own test results confirmed a 90+ percent oxygen purity and its electrical test was positive. Nihon Rufuto advised Nidek that Nihon Rufuto would proceed with the approval application with the Ministry of Health. Over the next several months Nidek worked to prepare the prototype and the documentation Nihon Rufuto needed for the application.

## F.    2004 Change to 2505 BLDC Compressor

The original April 19, 2002 business proposal listed a "Thomas 32 stroke compressor." However, at an October 2004 meeting, Nihon Rufuto asked Nidek to incorporate a 2505 BLDC compressor into the Unity Project. The 2505 BLDC compressor was not yet sold on the market and a sample unit was unavailable for

testing. Further, the 2505 BLDC compressor ran on DC power, while the Thomas compressor in the prototypes used AC power.[4] And, the 2505 BLDC compressor was more expensive. Nihon Rufuto also asked Nidek, among other things, to reduce the cabinet size. Nidek spent many hours making the requested changes and researching the 2505 BLDC compressor and the adjustments needed to incorporate it into the oxygen concentrator.

At meetings in March and August 2005, Nihon Rufuto asked for even more design changes and other modifications, including reducing the weight of the concentrator by ten kilograms. Nihon Rufuto insisted on incorporating the 2505 BLDC compressor even though it was still not available on the market and also asked for drastic changes to the oxygen monitoring system board and a total cabinet redesign. According to Nidek's Holman, Nihon Rufuto's requested changes transformed the Unity Project into "another project altogether," and placed "unreasonable demands" on Nidek. Although Nidek spent hundreds of hours making Nihon Rufuto's changes, Nihon Rufuto did not want to pay any additional money to Nidek.

## G.    2005 Termination of Unity Project

---

[4]It appears that at some point the parties agreed to switch to a Thomas 34 stroke compressor; however, both compressors used AC power.

On August 8, 2005, Nihon Rufuto's president Ichida sent a letter to Nidek stating that three years after the agreement to commence the Unity Project, "this project and the specification as well as the exterior design is still so far away to be accepted in [the] Japanese market." Nidek continued to make changes to the CAD database and oxygen monitory system board specification charges into 2006. Once this work was completed, Nidek submitted its drawings and documents to Nihon Rufuto. Nihon Rufuto turned these documents over to companies outside Nidek's control. Nihon Rufuto terminated the Unity Project and, in June 2006, sent a demand letter for $1,7020,000 in damages.

## H.    District Court Proceedings

On January 9, 2009, Nihon Rufuto filed this diversity action against Nidek alleging claims of breach of contract and fraud under Alabama law. The district court concluded that Nihon Rufuto's fraud claim was time-barred. Nihon Rufuto's appellate brief expressly abandons the fraud claim.

With respect to the contract claim, Nihon Rufuto alleged that Nidek's oxygen concentrator prototypes never met the agreed-upon specifications and that Nidek abandoned further efforts to fulfill its part of the contract in May 2006.

Following discovery, Nidek moved for summary judgment, arguing, inter alia, that the terms of the alleged contract between the parties were too indefinite

to be enforceable under Alabama law.  The district court agreed and entered summary judgment in favor of Nidek on Nihon Rufuto's breach of contract claim.  Nihon Rufuto filed this appeal.[5]

## II.  DISCUSSION

Under Alabama law, to establish a breach of contract claim the plaintiff must prove: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract; (3) the defendant's nonperformance, and (4) damages."  S. Med. Health Sys., Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995).  Thus, Nihon Rufuto bore the burden to prove that it entered into a valid contract with Nidek.  We agree with the district court that Nihon Rufuto did not present evidence of a valid contract under Alabama law.

"A contract cannot be formed without an offer, an acceptance,

---

[5]"This Court reviews de novo summary judgment rulings and draws all inferences and reviews all evidence in the light most favorable to the non-moving party."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, . . . . [t]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986) (quoting former Rule 56(c)).  Whether a contract is too indefinite to be enforced is a question of law.  White Sands Grp., LLC v. PRS II, LLC, 998 So. 2d 1042, 1052-53 (Ala. 2008).  Accordingly, our review of this legal issue is also de novo.  See Zaklama v. Mount Sinai Med. Ctr., 906 F.2d 650, 652 (11th Cir. 1990) (stating that issues of contract interpretation are questions of law generally reviewed de novo).

consideration, and mutual assent to those terms essential to the contract." Drummond Co., Inc. v. Walter Indus., Inc., 962 So. 2d 753, 754 (Ala. 2006). "To be enforceable, the essential terms of a contract must be sufficiently definite and certain, and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness." White Sands, 998 So. at 1042 (citations, quotation marks and brackets omitted).  A contract can lack definiteness as to "time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement."  Id. (emphasis added).

"The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  Id. (quotation marks and emphasis omitted); see also Smith v. Chickamauga Cedar Co., 82 So. 2d 200, 203 (Ala. 1955) ("[I]f the offer is in any case so indefinite as to make it impossible for a court to decide just what it means, and to fix exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement.").  "Additionally, in order for an alleged contract to be considered void based on the indefiniteness of its terms, the indefiniteness must reach the point where construction becomes futile."  Poole v. Prince, 61 So. 3d 258, 275 (Ala. 2010) (quotation marks and brackets omitted).  "A court will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the

13

parties evidently intended to enter into a binding contract." Id. Further, "[w]here it is clear that a written instrument was not intended to reflect the full agreement of the parties" and there is evidence that the parties reached an agreement as to omitted terms rather than left them "open for future agreement," the parties may use parol evidence "to clarify the omitted terms." Id. at 279-80 (quotation marks omitted).

As evidence of an alleged contract with Nidek, Nihon Rufuto points to: (1) the May 8, 2002 letter by Nidek's Chitlangia that listed the ten broad catagories of work associated with the project; and (2) the May 25, 2002 email by Nidek's Chitlangia outlining seven general tasks and ballpark completion dates in 2002. In addition, Nihon Rufuto contends that Nidek's April 19, 2002 business proposal contains the product specifications and goals and is admissible parol evidence to fill in omitted terms.

These three documents, even taken together, are too indefinite as to the work Nidek was to perform be enforceable. The documents reflect that many of the engineering and design details for the oxygen concentrator were to be settled by future agreement or were contingent upon Nihon Rufuto's later approval. For example, according to the April 19, 2002 business proposal, both Nihon Rufuto's and Nidek's contributions were still "to be discussed," and Nihon Rufuto would

14

still need to "[d]efin[e] the product specifications" (although some specifications were attached), "[p]rovid[e] guidance for cabinet design," and agree with the quality measures Nidek had yet to prepare.  The attached list of specifications and other project requirements notes that both the system alarm and the cabinet construction are "[t]o be discussed."

The May 8, 2002 letter states that, after meeting with Nihon Rufuto, Nidek had "[a] basic understanding of [Nihon Rufuto's] requirements" for the Unity Project, but that "as [they] progress toward this project, [Nidek] will have some questions, which may change the scope of [Nidek's] proposal."  After making "certain assumptions," (that are unspecified) the letter states that Nidek proposes dividing the project into four phases: component review and selection, industrial design, tooling design and pre-production pilot.  The letter outlines ten "broad categories" to be included in the proposed engineering and design effort, some of which will require Nihon Rufuto's approval.  The first category is "[s]pecific agreement with Nihon Rufuto for product specifications and project goals," clearly indicating that the parties had not yet had a meeting of the mind on those terms. The second category reiterates that Nidek will need Nihon Rufuto's agreement as to quality measures.  Similarly, as to the seventh and eighth categories, Nidek will need Nihon Rufuto's agreement as to the manufacturing process and procedures

15

and the quality procedures and documents.

The final document, Nidek's Chitlangia's May 25, 2002 email, outlines a series of steps Nidek proposed to take, many of which would require Nihon Rufuto's approval or "input" before Nidek could proceed to the next step. For instance, Nidek agreed to select a design with Nihon Rufuto's input and await Nihon Rufuto's approval of the machine's schematic before making prototype parts and two prototypes. Then, depending of the results of both parties' testing of the prototypes, the email contemplates changes to the design, only after which would Nidek build another prototype to be submitted for regulatory approval with the Ministry of Health. The number of contingencies and Nihon Rufuto's ability to vary the plans at different phases suggests the parties did not have mutual assent as to the work Nidek was to do.

Nihon Rufuto argues that any uncertainties were removed by Nidek's development of the prototypes, for which Nihon Rufuto paid Nidek $129,350. See Chickamauga Cedar Co., 82 So. 2d at 203 ("stating that "[o]ffers which are originally too indefinite may later acquire precision and become valid offers, by the subsequent words or acts of the offeror or his assent to words or acts of the offeree"). The problem for Nihon Rufuto is that the parties' subsequent words and actions in developing the prototypes do not add precision. Instead, subsequent

16

events only further highlight that there was no firm understanding between the parties as to what exactly Nidek was required to design.

Nihon Rufuto began asking for changes as soon as Nidek delivered the first prototype and continued asking for changes over the entire three-year period Nidek worked on the Unity Project. In addition to requests to reposition various component parts, to redesign the oxygen monitoring system board and to repeatedly tweak the cabinet design, Nihon Rufuto asked for three different compressors to be incorporated into the machine—first a three liter compressor, then a five liter compressor and finally a 2505 BLDC compressor. These compressor changes required Nidek to redesign other aspects of the machine and the cabinet, such that Nidek's project manager said it became "another project altogether." In sum, the Unity Project was a constantly moving target, and the parties actions during the development of the prototypes did not remove the uncertainty as to what work Nidek was to perform under the alleged contract.

Because the three documents Nihon Rufuto relies upon to show a contract are too indefinite as to the essential term of what work Nidek was to perform, they do not provide a basis for determining whether Nidek breached the alleged contract. Thus, under Alabama law, the alleged contract is unenforceable, and the district court properly granted summary judgment to Nidek.

17

**AFFIRMED.**